[Cite as *State v. Bennett*, 2019-Ohio-4937.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                  CASE NO. 16-19-03

     v.

JAMES E. BENNETT,                    O P I N I O N

     DEFENDANT-APPELLANT.

Appeal from Wyandot County Common Pleas Court
Trial Court No. 18-CR-0081

**Judgment Affirmed**

**Date of Decision:   December 2, 2019**

APPEARANCES:

    *Joel M. Spitzer* **for Appellant**

    *Douglas D. Rowland* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, James E. Bennett ("Bennett"), brings this appeal from the June 17, 2019, judgment of the Wyandot County Common Pleas Court sentencing him to twenty-four months in prison after Bennett was convicted in a bench trial of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree. On appeal, Bennett argues that there was insufficient evidence presented to convict him, that his conviction was against the manifest weight of the evidence, that his sentence was not supported by the record, that the trial court erred by failing to hold an evidentiary hearing before quashing a subpoena for tax records of the child-victim's parents, and that the trial court erred by permitting "hearsay" statements at trial.

*Background*

{¶2} For nearly fifty years Bennett's wife, Cheri[1], ran a childcare business out of their home. On April 25, 2018, Cheri was the babysitter for the daughter of Katie L. and Aaron L., A.L, who was four years old. Cheri had been babysitting A.L. since shortly after A.L. was born. Prior to babysitting A.L., Cheri was the babysitter for A.L.'s older sister N.L. until N.L. started school. The Bennetts and

---

[1] There are different spellings for Bennett's wife's first name included in the record. In the trial transcript, her first name is spelled "Cheri," so we use that for purposes of this appeal. In the December 6, 2018, hearing, her name was spelled "Sherri." In Bennett's brief, he refers to her as "Sherry." The spelling of her first name makes no difference to this appeal; however, we are aware the record contains a discrepancy.

the victim's family had a lengthy, ongoing relationship that all involved described as positive prior to the incident leading to this case.

{¶3} After work on April 25, 2018, Katie L. picked up A.L. from the Bennett residence and brought A.L. home. The family had dinner, and then shortly thereafter Aaron L. was preparing A.L. for a bath. At that time, Aaron noticed that A.L. was hesitant and did not want to get into the bathtub. Aaron asked A.L. what the problem was and A.L. said that "her girl parts hurt." (Tr. at 16). Aaron noticed that A.L.'s vagina was visibly red. Aaron asked A.L. why it hurt and she told Aaron that Bennett "had touched her." (*Id*. at 17). Aaron asked if A.L. meant the touching occurred when Bennett was "helping her on or off the potty" and whether Bennett had possibly "wiped her too hard," but A.L. said no. (*Id*.) Aaron inquired again regarding whether the touching was bathroom-related and A.L. again said no. A.L. said that Bennett touched her during naptime while Cheri was upstairs with the puppies napping. Aaron proceeded to bathe A.L. then told Katie to talk to A.L.

{¶4} Katie went to dry A.L. after the bath and noticed that A.L.'s "bottom" was red. Katie asked if A.L.'s pants were irritating her and A.L. told Katie that Bennett had caused the problem. Katie asked how Bennett hurt A.L. and A.L. said that Bennett "rubbed her very hard with his hands" during nap time. (Tr. at 43). A.L. reiterated that Cheri was upstairs with the puppies and that the other children that Cheri was babysitting were sleeping on a quilt. A.L. told Katie that Bennett

told her to "scoot down, [that] he started rubbing [her] really hard with his hands and when he was done, he told [her] to pull [her] pants back up and to go lay back down." (*Id*. at 43-44). Katie indicated that A.L. had never made any type of accusation like that before.

{¶5} Aaron and Katie contacted a friend who worked with a Sheriff's department. They also collected the clothes that A.L. had been wearing that day, including her underwear, and put them into a bag. On the next day, A.L. was taken for a sexual assault examination conducted by a sexual assault nurse examiner ("SANE"). At that time the SANE noted that there was some redness in A.L.'s genitalia, though she stated that was not uncommon for a four year old. The SANE asked A.L. if anyone had touched her and A.L. did not respond. A.L. did not make a disclosure to the SANE, and the SANE stated that A.L. was very shy during the examination.

{¶6} On May 7, 2018, a forensic interview of A.L. was conducted at Nationwide Children's Hospital. During that interview A.L. did not disclose anything and she indicated that she had not been improperly touched.

{¶7} The clothes that had been collected from A.L. were sent to BCI for testing. A forensic scientist did a screening test on the underwear for semen and a separate screening test for "amylase," which was commonly found in high concentrations in saliva, but could also be from other bodily fluids such as sweat or

urine. While there was no semen detected in A.L.'s underwear, the crotch area of A.L.'s underwear tested positive for amylase DNA from an unknown male.

{¶8} Bennett was interviewed by the police on June 6, 2018. He stated that he never helped A.L. use the bathroom and that he had no contact with her private areas whatsoever. He stated that A.L. went to the bathroom by herself, and that she used a bathroom downstairs. He willingly gave a DNA sample when asked. DNA was also taken from A.L.'s father.

{¶9} The DNA analysis revealed that DNA consistent with Bennett's was present in both samples taken from A.L.'s underwear. In fact, Bennett was included in the mixture at a rate rarer than one in one trillion, which the forensic scientist testified was the highest reportable statistic. Aaron was excluded as a contributor to the DNA in the crotch region of A.L.'s underwear.

{¶10} Bennett was interviewed a second time after the DNA results returned. He again denied knowing how it was possible that his DNA would be in A.L.'s underwear.

{¶11} On July 11, 2018, Bennett was indicted for one count of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree. Bennett pled not guilty to the charge.

{¶12} On October 15, 2018, the State filed a "Motion to Allow Child's Statements at Trial Pursuant to Evidence Rule 807." The State contended that

Evid.R. 807(A) allowed statements made by a child under twelve describing a sexual act to be admissible notwithstanding hearsay issues. In order for the statements to be admissible under Evid.R. 807, the trial court would have to find that under the totality of the circumstances the statement was reliable and trustworthy, that the child's testimony was not reasonably obtainable by the proponent of the statement, and that there was independent proof of the sexual activity. The State contended that all requirements of Evid.R. 807 were met in this case to allow A.L.'s parents to testify to the statements she made to them on April 25, 2018.

{¶13} On October 16, 2018, Bennett filed a motion to suppress A.L.'s statements, seeking to prevent them from being introduced at trial.

{¶14} A hearing was held on October 30, 2018, and December 6, 2018, for purposes of determining the admissibility of Evid.R. 807 testimony, and for a determination on Bennett's suppression motion. On December 6, 2018, the trial court conducted an *in camera* interview of A.L., who was five years old at the time. Ultimately the trial court found that A.L. was incapable of testifying in this matter.

{¶15} The trial court then heard the testimony of A.L.'s parents and the arguments of the parties regarding the potential admissibility of A.L.'s statements to her parents. At the conclusion of the hearing, the trial court determined as follows.

> **The Court found the disclosure of sexual activity made by A.L.L. to her parents are admissible pursuant to Evidence Rule 807. Therefore, both Aaron [L]. and Katie [L]. are permitted to testify at trial regarding the disclosure made by A.L.L. to her parents. The disclosure was made in close proximity to the alleged sexual activity. The child's statements to her parents were consistent. The statements given the totality of the circumstances are trustworthy. There is independent proof of sexual activity given the report from the Attorney General's Office related to the Defendant's DNA on A.L.L.'s underwear.**

(Doc. No. 31). The trial court thus granted the State's motion pursuant to Evid.R. 807 and denied Bennett's suppression motion.

{¶16} Subsequently, Bennett filed a written waiver of a jury trial, electing to proceed to a bench trial.

{¶17} On January 8, 2019, Bennet filed subpoenas duces tecum seeking Aaron and Katie's tax records from 2016, 2017, and 2018. Bennett also sought tax records from Aaron's construction business. Bennett requested that Katie and Aaron bring the tax documents to trial.

{¶18} On January 11, 2019, the State filed a "Motion to Quash" the subpoenas duces tecum issued to Aaron and Katie. The State argued that Crim.R. 17(C) provided the court the authority to quash or modify a subpoena if compliance was unreasonable or oppressive. The State argued that the information sought was irrelevant to the trial.

{¶19} On January 17, 2019, Bennett filed a response arguing that he had a right to confront witnesses and that there was the potential that Aaron and Katie

were not as financially stable as they maintained at the suppression hearing. Bennett argued that if they were not financially stable, they may have given false and misleading testimony. The defense insinuated that it was possible that Aaron and Katie owed the Bennetts money, though there was no indication of that at the time of the request. The defense argued that the tax records were necessary for impeachment purposes.

{¶20} On January 22, 2019, the trial court filed a judgment entry granting the State's motion to quash the subpoenas duces tecum requesting Aaron and Katie to produce tax records. In its entry on the matter, the trial court stated, "Upon consideration of same, and for good cause shown, the Court finds said Motion [to Quash] to be well-taken." (Doc. No. 54).

{¶21} On February 5, 2019, Bennett filed a notice of alibi stating that he was golfing from mid-morning to mid-afternoon on April 25, 2018. After the State requested that Bennett be more specific, Bennett amended his notice of alibi to state that he was golfing specifically at Bob's Countryside Golf Course north of Upper Sandusky.

{¶22} On February 15, 2019, Bennett filed a new amended notice of alibi, indicating that he was actually golfing at the Bucyrus Country Club/Valley View Golf Course on the day of the alleged incident.

{¶23} The matter proceeded to a bench trial on February 25-26, 2019. The State presented the testimony of Katie, Aaron, the SANE who examined A.L., the forensic scientists involved in the DNA testing of A.L.'s underwear, and the detective who investigated the matter/interviewed Bennett. The DNA results and the interviews with Bennett were also introduced into evidence.

{¶24} In Bennett's case-in-chief, he presented the testimony of his wife, Cheri, who testified that she never left the children alone in a situation where something could have happened to them. In addition, Cheri testified that she remembered the day in question because it was her granddaughter's birthday. Cheri testified that when her daughter called that day Bennett was not home. Moreover, Cheri testified that Bennett was a smoker and that he spit often, including into the toilet. The defense suggested this as a possible reasoning for amylase DNA being in A.L.'s underwear.

{¶25} Bennett's daughter also testified that when she called her parents' residence on April 25, 2018, her father was not at home. In addition, she testified that she looked up the weather for that day and it was a nice day.

{¶26} Bennett presented the testimony of two people who testified that on nice days Bennett would golf with them. However, they testified they did not know if they golfed with Bennett specifically on April 25, 2018. All the witnesses that

knew Bennett testified to his good character and that he regularly hacked and spit due to his smoking habit.

{¶27} Bennett also presented the testimony of the social worker that interviewed A.L. at Nationwide Children's Hospital. The social worker testified that A.L. did not disclose that anything had happened to her in the interview. That interview was introduced into evidence.

{¶28} In addition, Bennett presented the testimony of a doctor who reviewed the records in this matter, in particular the forensic interview at Nationwide Children's Hospital, and concluded that she did not "see anything in there that is convincing that [A.L.] was sexually abused from that piece of evidence." (Tr. at 315). However, she admitted that A.L. might not have understood that the touching she received, if it happened, was traumatic or sexual abuse.

{¶29} Finally Bennett testified on his own behalf, indicating that he was a retired Ohio State Highway Patrolman, that he was still active as a court bailiff and that he had a side job transporting individuals to medical appointments. Bennett testified that according to his phone records he was around Bucyrus shortly before 12:30 p.m. on the date in question, which was at a time when the children usually took naps. Bennett testified that he never touched A.L., and that he had never been alone with her. He testified that he was shocked that the results came back with his DNA in A.L.'s underwear.

{¶30} At the conclusion of the trial, the trial court found Bennett guilty of Gross Sexual Imposition as charged. Sentencing was set for a later date.

{¶31} On May 30, 2019, Bennett filed a sentencing memorandum arguing in favor of being placed on community control.

{¶32} On May 31, 2019, Bennett filed a motion for leave to file a motion for a new trial *instanter*. He argued that he received ineffective assistance of trial counsel for his trial counsel advising him to proceed to a bench trial rather than a jury trial.

{¶33} On May 31, 2019, the case proceeded to sentencing. Prior to sentencing Bennett, the trial court granted Bennett leave to file his motion for a new trial *instanter*, and heard Bennett's argument on the motion. The trial court then overruled Bennett's motion for a new trial. Afterward, the trial court proceeded to sentencing and Bennett was ordered to serve twenty-four months in prison. A judgment entry memorializing Bennett's sentence was filed June 17, 2019. It is from this judgment that Bennett appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court abused its discretion when it entered a judgment against the appellant when the judgment was not supported by the manifest weight of the evidence.**

**Assignment of Error No. 2**
**The trial court erred when it failed to grant the defendant's motion for acquittal as the guilty verdict at the trial court was not supported by sufficient evidence.**

**Assignment of Error No. 3**
**The trial court's sentence of appellant was not supported by the record and was contrary to law.**

**Assignment of Error No. 4**
**The trial court abused its discretion when it granted the State's motion to quash without holding an evidentiary hearing.**

**Assignment of Error No. 5**
**The trial court erred when it admitted hearsay statements pursuant to Evidence Rule 807, denying Appellant's constitutional right to confront his accuser.**

{¶34} We elect to address the assignments of error out of the order in which they were raised.

*Fifth Assignment of Error*

{¶35} In his fifth assignment of error, Bennett argues that the trial court erred by permitting the State to present A.L.'s statements to her parents pursuant to Evid.R. 807(A).

Standard of Review

{¶36} A trial court's decision to admit statements under Evid.R. 807 is reviewed under an abuse of discretion standard. *State v. Singleton*, 8th Dist. Cuyahoga No. 103478, 2016-Ohio-4696, ¶ 21, citing *In re A.K.*, 2d Dist. Montgomery No. 26199, 2015-Ohio-30, ¶ 16; *State v. Cook*, 3d Dist. Allen No. 1-

Case No. 16-19-03

11-66, 2013-Ohio-5081, ¶ 19. An abuse of discretion implies that the trial court's determination was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

Analysis

**{¶37}** Generally hearsay is not admissible at trial pursuant to Evid.R. 802. However, hearsay evidence may be admissible if it falls into one of the enumerated exceptions found in the Rules of Evidence. One such exception is Evid.R. 807(A), which allows out-of-court statements made by a child under the age of twelve to be admitted where those statements describe a sexual act performed by, with, or on the child. Evidence Rule 807(A) contains specific requirements for admissibility of such statements, and it reads as follows.

**(A) An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing any sexual activity performed, or attempted to be performed, by, with, or on the child or describing any act or attempted act of physical harm directed against the child's person is not excluded as hearsay under Evid.R. 802 if all of the following apply:**

**(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement,**

**the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual activity or attempted sexual activity, or of the act or attempted act of physical harm directed against the child's person;**

**(2)   The child's testimony is not reasonably obtainable by the proponent of the statement;**

**(3)   There is independent proof of the sexual activity or attempted sexual activity, or of the act or attempted act of physical harm directed against the child's person;**

**(4)   At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.**

The Supreme Court of Ohio has described Evid.R. 807(A)'s requirements as a "high threshold." *State v. Silverman*, 121 Ohio St.3d 581, 2009-Ohio-1576, ¶ 26.

{¶38} In this case, the State filed a motion to present Evid.R. 807 testimony well prior to the trial, thus clearly complying with Evid.R. 807(A)(4).  The trial court then conducted a hearing on the State's motion to determine the admissibility of the statements A.L. made to her mother Katie and her father Aaron.

{¶39} Both Katie and Aaron testified at the hearing regarding the circumstances surrounding A.L.'s disclosure on April 25, 2018, and regarding the statements that A.L. made at that time.  Following the testimony, and the arguments

of the parties, the trial court found that "[t]he disclosure was made in close proximity to the alleged sexual activity. The child's statements to her parents were consistent. The statements given the totality of the circumstances are trustworthy." (Doc. No. 31). At the hearing the trial court elaborated that there did not appear to be any motive for fabrication. The trial court thus found that Evid.R. 807(A)(1) was satisfied.

{¶40} As to the second element of Evid.R. 807, the trial court conducted an *in camera* interview of A.L. Following the *in camera* interview, the trial court stated that A.L. was shy and willing to help but unable to engage in a discussion. The trial court found that due to A.L.'s age and "inability to verbalize much in a context of a courtroom situation, her testimony * * * just wouldn't produce anything of value. * * * She just from what I observed there isn't much hope that she could really be a witness[.]" (Dec. 6, 2018, Tr. at 5-6). Thus the trial court determined that A.L.'s testimony could not be obtained, satisfying Evid.R. 807(A)(2).

{¶41} As to the third element of Evid.R. 807, specifically 807(A)(3), which requires independent proof of the sexual act, the trial court found that Bennett's DNA in the crotch region of A.L.'s underwear supplied independent proof in this matter. Thus after reviewing all of the elements of Evid.R. 807(A), the trial court found A.L.'s statements to her parents on April 25, 2018, were admissible.

{¶42} In our own review of the matter, we cannot find that the trial court abused its discretion. The trial court held a hearing and addressed each of the requirements of Evid.R. 807(A) and made appropriate findings supporting its conclusions that A.L.'s statements to her parents should be admissible at trial. Where a trial court has conducted a clear analysis of the appropriate elements and the evidence supports the trial court's findings, we cannot find that a trial court abused its discretion in admitting Evid.R. 807(A) testimony. *See State v. Cook*, 3d Dist. Allen No. 1-11-66, 2013-Ohio-5081, ¶ 23 (requirements of 807 met where child's testimony was not obtainable due to, *inter alia*, young age, the court considered the factors of 807(A)(1), the State filed its motion more than 10 days prior to trial, and independent proof was provided through a confession of the defendant).

{¶43} Moreover, under similar circumstances to the case *sub judice*, where a child was determined to "be unable to speak or relate anything to the court" and where there was DNA in the child's underwear to supply independent proof of sexual contact, a child's statements have been found to be admissible at trial under Evid.R. 807(A). *State v. Deleon*, 6th Dist. Sandusky No. S-12-020, 2013-Ohio-2029, ¶¶ 24-31. We find this case analogous to *Deleon*. For all of these reasons we cannot find that the trial court abused its discretion in this matter. Therefore, Bennett's fifth assignment of error is overruled.

*Second Assignment of Error*

**{¶44}** In Bennett's second assignment of error, he argues that the trial court erred by denying his motion for acquittal. He contends that the State presented insufficient evidence to convict him of Gross Sexual Imposition.

Standard of Review

**{¶45}** A motion for acquittal tests the sufficiency of the evidence presented by the State at trial. *State v. Disabato*, 3d Dist. Union No. 14-18-23, 2019-Ohio-3542, ¶ 11. Therefore, we review a trial court's decision denying a motion for acquittal using the same standard used in a sufficiency of the evidence claim. *Id.* quoting *State v. Moore*, 3d Dist. Union No. 14-08-43, 2009-Ohio-2106, ¶ 20, citing *State v. Lightner*, 3d Dist. Hardin No. 6-08-11, 2009-Ohio-544, ¶ 11, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995).

**{¶46}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence.").

Analysis

{¶47} In this case, Bennett was convicted of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), which reads as follows.

> **(A)  No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:**
>
> **\* \* \***
>
> **(4)   The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.**

{¶48} In order to convict Bennett at trial of Gross Sexual Imposition, the State presented testimony that on April 25, 2018, A.L. claimed that Bennett rubbed her very hard in her private region.  A.L.'s parents both noted some redness in the

area, as did the SANE the next day. The underwear that was worn by A.L. was collected and sent for DNA testing. "Amylase" DNA consistent with Bennett's was found in the crotch region of A.L.'s underwear.[2]

{¶49} On appeal, Bennett argues that even when looking at the evidence in the light most favorable to the State, the State did not establish that any touching of A.L. was done for the purpose of sexually arousing or gratifying either person. Bennett argues that such specific intent seeking sexual arousal or gratification had to be shown pursuant to *State v. Dunlap*, 129 Ohio St.3d 461, 2011-Ohio-4111, ¶ 25, in order to support a conviction for Gross Sexual Imposition.

{¶50} Notably, there is no specific requirement for direct testimony regarding sexual arousal or gratification; rather, in determining whether sexual contact occurred, the factfinder may infer from the evidence whether a defendant's contact with an erogenous zone under R.C. 2907.01(B) was for the purpose of sexual arousal or gratification. *State v. Fears*, 8th Dist. Cuyahoga No. 104868, 2017-Ohio-6978, ¶ 64, *appeal not allowed*, 152 Ohio St.3d 1409, 2018-Ohio-723. The purpose of the contact may be inferred from the type, nature, and circumstances of the contact. *Fears* at ¶ 65, citing *State v. Tate*, 8th Dist. Cuyahoga No. 98221, 2013–Ohio–370, ¶ 20; *Sate v. Cobb*, 81 Ohio App.3d 179, 185 (9th Dist.1991).

---

[2] There was testimony that saliva can be used as a lubricant, and that amylase was most prevalent in saliva. However, amylase could be present in other bodily fluids such as sweat.

{¶51} In this case, looking at the facts in the light most favorable to the State as we are directed on review, there was testimony that Bennett rubbed A.L.'s vaginal region "very hard" and then ordered her to pull her pants up and go join the other children. A rational trier-of-fact could infer that Bennett's actions constituted sexual contact and were for the purposes of sexual arousal or gratification. *See State v. Hodgkin*, 1st Dist. Hamilton No. C-170689, 2019-Ohio-1686, ¶¶ 9-13. As A.L. was clearly under thirteen years of age, we cannot find that the State presented insufficient evidence in this matter to convict Bennett at trial of Gross Sexual Imposition. Therefore his second assignment of error is overruled.

*First Assignment of Error*

{¶52} In Bennett's first assignment of error, he argues that his conviction for Gross Sexual Imposition was against the manifest weight of the evidence.

Standard of Review

{¶53} In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created

such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

{¶54} Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Analysis

{¶55} Bennett presented the testimony of a number of witnesses in his case-in-chief, and he also testified in his own defense. Bennett maintained that he was golfing on the day in question, which he contends was corroborated by his phone records indicating that at one point shortly before 12:30 p.m. he was near Bucyrus. He argues that his absence in the residence was further corroborated by the testimony of his wife and daughter that when his daughter called on April 25, 2018, Bennett was not at home at the time.

{¶56} Furthermore, Bennett argues that he was forthcoming and cooperative in the investigation, readily meeting with law enforcement and voluntarily providing a DNA sample. Bennett adamantly denied ever touching A.L., or helping her use

the bathroom; however, he surmised that it was possible that his smoking habit, which caused him to spit often, potentially led to the DNA contamination.[3]

{¶57} Bennett's wife also testified that she almost never left the children alone, especially to take a nap like A.L. had told her parents. In addition, Bennett emphasized throughout the trial that A.L. did not make any disclosures to medical professionals or during the forensic interview; rather, she only told her parents of the purported touching.

{¶58} Notably, all of this evidence was before the trial court, and the trial court weighed it all in making its finding of guilt in this matter. Following closing arguments, the trial court conducted an analysis, summarizing some of the testimony presented and acknowledging some of the points that the defense made. However, the trial court found that Bennett's alibi was not dispositive as it did not account for the entire nap period on April 25, 2018, or the entire day that A.L. was at the Bennetts' residence for that matter. The trial court also indicated that it was specifically swayed by the strength of the "clear" DNA evidence, particularly given where it was located in the underwear that had been worn by A.L. on the day of the incident in question. (Tr. at 406).

---

[3] When Bennett was interviewed by the police after the DNA results came back, the police officer mistakenly said that the DNA results were definitive that the substance was saliva. Testimony at trial revealed that amylase could come from other bodily fluids. However, it is possible that Bennett developed his "spitting" defense in light of the fact that the officer made it sound like the DNA present only could have come from saliva, where amylase is found in very high concentrations.

{¶59} Moreover, the trial court made its determination after being able to see and hear the testimony of Bennett himself, and judge his credibility. The factfinder is in the best position to evaluate credibility of witnesses, and we will not second-guess the factfinder on these matters. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶60} Given the testimony that was presented, we cannot find that the factfinder "clearly lost its way" where testimony indicated that: 1) A.L.'s genitals were red and irritated on the date in question; 2) A.L. made statements to her parents that Bennett had rubbed her very hard there; 3) Bennett's DNA was found specifically in the crotch region of A.L.'s underwear; and 4) Bennett himself stated that he never assisted A.L. in the bathroom. Based on this evidence, and giving deference to the trial court's credibility determinations, we cannot find that Bennett's conviction was against the manifest weight of the evidence. Therefore Bennett's first assignment of error is overruled.

*Third Assignment of Error*

{¶61} In Bennett's third assignment of error, he argues that the trial court erred by sentencing him to serve twenty-four months in prison.

Standard of Review

{¶62} Revised Code 2953.08(G)(2) provides that when reviewing felony sentences, a reviewing court may increase, reduce, or modify a sentence, or it may

vacate and remand the matter for resentencing, only if it clearly and convincingly finds that either the record does not support the sentencing court's statutory findings or the sentence is contrary to law. *State v. Kerns*, 3d Dist. Logan No. 8-18-05, 2018-Ohio-3838, ¶ 10, citing *State v. Martin*, 8th Dist. Cuyahoga No. 104354, 2017-Ohio-99, ¶ 7.

Analysis

{¶63} " 'The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than [a] minimum sentence[].' " *State v. Castle*, 2d Dist. Clark No. 2016-CA-16, 2016-Ohio-4974, ¶ 26, quoting *State v. King*, 2d Dist. Clark No. 2012-CA-25, 2013-Ohio-2021, ¶ 45; *State v. Freeman*, 3d Dist. Union No. 14-18-16, 2019-Ohio-669, ¶ 11. Nevertheless, when exercising its sentencing discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Kerns*, 3d Dist. Logan No. 8-18-05, 2018-Ohio-3838, ¶ 8, citing *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, ¶ 38.

{¶64} Revised Code 2929.11 provides that sentences for a felony shall be guided by the overriding purposes of felony sentencing: "to protect the public from future crime by the offender and others and to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the

court determines accomplish those purposes without imposing an unnecessary burden on state of local government resources." R.C. 2929.11(A). In order to comply with those purposes and principles, R.C. 2929.12 instructs a trial court to consider various factors set forth in the statute relating to the seriousness of the offender's conduct and to the likelihood of the offender's recidivism. R.C. 2929.12(A)-(E).

{¶65} In the case *sub judice*, Bennett was convicted of Gross Sexual Imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree. Pursuant to R.C. 2907.05(C)(2), a violation of R.C. 2907.04(A)(4) carries a presumption that a prison term should be imposed. Revised Code 2929.14(A)(3)(a) states that the prison term for a violation of R.C. 2907.05 shall be twelve, eighteen, twenty-four, thirty, thirty-six, forty-two, forty-eight, fifty-four, or sixty months. Thus the imposition of a twenty-four month prison sentence in this matter was within the statutory range. In fact, it was in the lower end of the range. Nevertheless, Bennett argues that his sentence was clearly and convincingly contrary to law.

{¶66} In fashioning its sentence in this matter, the trial court stated that it had considered the record, the PSI, the statements made at sentencing, etc. The trial court analyzed R.C. 2929.11 and the factors in R.C. 2929.12 and stated as follows.

> **As to the, uh, serious factors that make this offense more serious, the injury was to a victim who, uh, is of a very minor age, to wit four years at the time of the offense. Also, uh, there was, uh, at least some potential, uh, serious physical and psychological harm**

**in that this was a sexual offense. The, uh, on the other side, the offender – uh, well, excuse me, the offender held a public position which makes the offense worse from that perspective and the uh, offender's relationship, uh, with the victim of course does play into those factors. Those are the factors the Court does find.**

**Uh, on the other side of the coin, the factors that make this less serious is that, uh, the offender has no criminal record, no juvenile record, uh, he has, uh, led a law-abiding life for all of his life and has served in various, uh, public positions, uh, of respect and, uh, service to the community. Uh, so the Court is considering all of those factors.**

**This is a sexual offense that is, uh, of a third degree and the potential penalties are one to five years, uh, in prison. The presumption is that prison would be imposed and that can be rebutted and the defense has placed rebuttable evidence before the Court of substantial nature. Nonetheless, the Court does find that the offender is not amenable to community control and that prison is consistent with the purposes and principles of sentencing. The, uh, Court has no pleasure in so finding.**

(May 31, 2019, Tr. at 39-40).

{¶67} On appeal, Bennett argues that the trial court erred in its reasoning when it stated that the conduct here was more serious because Bennett was in a public position in the community. He argues that under the "seriousness" factors of R.C. 2929.12(B)(3), for conduct to be more serious the offender had to hold a position of trust in the community *and* the offense had to relate to that position. Bennett claims that the crime in this matter did not relate to his duty as a court bailiff

-26-

or as a former highway patrolman, thus the trial court erred in finding that conduct here was more serious because Bennett was in a public position.[4]

{¶68} The record is clear that the trial court stated that Bennett was in a public position at sentencing; however, the trial court did not state that the offense in this matter related to the position. Similarly, the trial court did not specifically cite R.C. 2929.12(B)(3) when stating that Bennett held a public position. This is important because there is a separate provision of R.C. 2929.12, specifically (B)(4), that states conduct is more serious if the offender's occupation or profession obliged the offender to prevent the offense or bring others committing it to justice. Being a bailiff and a former Ohio State Highway Patrolman, this factor arguably could apply and would not make the trial court's statement erroneous. Moreover, we note that the trial court also referred to these same public positions as *mitigating* factors in favor of a "less serious" finding for sentencing purposes.

{¶69} Nevertheless, even if we assumed that the trial court was specifically referring to the seriousness factor in R.C. 2929.12(B)(3) *and* that the trial court erred by determining that merely being in a public position was enough to make the conduct more serious in this case, the prison sentence still would not be clearly and

---

[4] In support of his argument, Bennett cites this Court's decision in *State v. McLemore*, 136 Ohio App.3d 550 (3d Dist.2000), wherein we reversed a trial court's sentence for misapplication of a different sentencing factor, specifically R.C. 2929.12(D)(4). That statutory provision involved an offender demonstrating a pattern of drug or alcohol abuse and the offender's refusal to acknowledge the pattern. It is thus facially inapplicable to this matter; however, Bennett argues that we should apply the reasoning that if the trial court misstated issues regarding sentencing factors in crafting its sentence, the sentence should be reversed.

convincingly contrary to law because there are several other factors noted by the trial court that support the prison sentence in this matter. *See State v. Lamb*, 6th Dist. Wood No. WD-03-054, 2004-Ohio-1974, ¶¶ 21-22 (even where trial court erred in applying R.C. 2929.12(B)(3), as long as the remaining factors are sufficient to justify a prison sentence, the sentence was not erroneous). Here there were several factors that made the conduct more serious, namely that the conduct was exacerbated due to the age of the victim, because it was a sexual offense (R.C. 2929.12(B)(1)), and because the offender's relationship with the victim facilitated the offense (R.C. 2929.12(B)(6)).

{¶70} Given that there was a presumption in favor of prison in this matter and given that there were independent factors to support the trial court's sentence, we cannot find that the trial court's sentence in this matter was clearly and convincingly contrary to law. Therefore, Bennett's third assignment of error is overruled.

*Fourth Assignment of Error*

{¶71} In Bennett's fourth assignment of error, he argues that the trial court erred by granting the State's motion to quash the subpoenas duces tecum that had been issued ordering Katie and Aaron to produce their tax records at trial for the previous three years.

-28-

Standard of Review

{¶72} Criminal Rule 17(C) gives the trial court discretion to quash or modify a subpoena, on motion of a party, if compliance would be "unreasonable or oppressive." *State v. Baker*, 12th Dist. Warren No. CA2009-06-079, 2010-Ohio-1289, ¶ 15, citing *State v. Russ*, 12th Dist. Clermont No. CA99-07-074, 2000 WL 864989. Generally a trial court's determination on a motion to quash a subpoena is reviewed for an abuse of discretion. *State v. Simonis*, 3d Dist. Seneca No. 13-14-05, 2014-Ohio-5091, ¶ 39; *Baker* at ¶ 15 citing *State v. Strickland*, 8th Dist. Cuyahoga No. 91982, 2009-Ohio-3906, ¶ 37.

Analysis

{¶73} In order to understand Bennett's request for the subpoenas duces tecum, and the State's corresponding motion to quash, we must put them in the proper context in this case. During the December 6, 2018, hearing on the State's motion to present Evid.R. 807(A) testimony, the issue of Aaron's and Katie's finances was first brought up *by the State* presumably in order to show that neither had a motive to fabricate a story on behalf of A.L. While Aaron was testifying, he was asked if he or Katie owed the Bennetts money for babysitting services or if they were behind in their payments. Aaron and Katie indicated that they regularly paid the Bennetts and that they had no prior issues. In fact, Aaron and Katie both testified that they had a good relationship with the Bennetts prior to April 25, 2018.

{¶74} On cross-examination, Aaron was asked what he profited from his business in 2017. Aaron responded that he believed it was around $50,000 but his accountant handled his taxes so he was not certain. That was largely the extent of testimony regarding financial information from the December 6, 2018, hearing.

{¶75} After the Evid.R. 807 hearing, Bennett filed subpoenas duces tecum seeking tax records for Aaron and Katie and for Aaron's business. Bennett requested that the tax records be brought to the trial so that they could be used for cross-examination. The State filed a motion to quash Bennett's subpoenas, arguing that Bennett was seeking irrelevant information to the matter. Bennett filed a response, claiming that the State opened the door to financial issues at the prior hearing, and that there was a possibility that Aaron and Katie had lied about their financial state. Bennett did not argue at that time that Aaron and Katie owed the Bennetts money or that they were delinquent in their babysitting payments. He contended that there was the potential for impeachable information in the tax records. Without holding a hearing, the trial court summarily granted the State's motion to quash.

{¶76} The case then proceeded to trial where there was some testimony presented regarding the parties' relationship, including their business relationship. The testimony did not indicate that Aaron and Katie were behind or delinquent in their payments for babysitting; in fact, the opposite was true. The testimony

indicated that they had timely paid. There was no testimony illustrating any financial issues relevant to this matter, or that Aaron and Katie had any financial motive to fabricate statements made by A.L.

{¶77} On appeal, Bennett argues that the trial court abused its discretion by granting the State's motion to quash the subpoenas duces tecum without holding a hearing. He contends that a hearing was mandatory to allow Bennett an opportunity to demonstrate why the subpoenaed documents were necessary, and that absent a hearing, reversal was warranted. He cites *In re Subpoena Duces Tecum Served Upon Atty. Potts*, 100 Ohio St.3d 97, 2003-Ohio-5234, in support.

{¶78} In *Potts*, the Supreme Court of Ohio constructed a bright line rule that reads as follows.

> **Pursuant to Crim.R. 17(C), when deciding a motion to quash a subpoena duces tecum requesting the production of documents prior to trial, a trial court shall hold an evidentiary hearing. At the hearing, which may be held in camera, the proponent of the subpoena must demonstrate that the subpoena is not unreasonable or oppressive by showing "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.' " (*United States v. Nixon* [1974], 418 U.S. 683, 699–700, 94 S.Ct. 3090, 41 L.Ed.2d 1039, followed.)**

*Potts* at syllabus.

{¶79} Bennett argues that based upon *Potts*, the trial court was required to hold an evidentiary hearing and to conduct the *Nixon* analysis adopted in *Potts* before quashing the subpoenas. He contends that because the trial court granted the State's motion to quash without a hearing, and without any type of *Nixon* analysis whatsoever, the trial court abused its discretion in this matter.

{¶80} We recognize that the *Potts* decision would seem to require a trial court to hold a hearing and conduct a *Nixon* analysis before it quashes a subpoena duces tecum. A number of Ohio Appellate Courts have addressed interlocutory appeals on this issue, including by third parties, and ordered a trial court to hold a hearing and conduct an analysis on the matter. *See Parma v. Schoonover*, 8th Dist. Cuyahoga No. 100152, 2014-Ohio-400 (non-party department of health appealed denial of its motion to quash subpoena, because there was no hearing or *Nixon* analysis, matter reversed); *Cincinnati v. Neff*, 1st Dist. Hamilton No. C-130411, 2014-Ohio-2026 (trial court's failure to conduct an evidentiary hearing before quashing a subpoena warranted reversal).

{¶81} Fewer appeals exist where a trial court has quashed a subpoena, or denied a motion to quash a subpoena, without a hearing and the matter proceeded all the way to a final judgment, which was then appealed. Even *Potts* dealt with an ancillary matter, it was not a direct appeal in the criminal case resulting from a final

judgment. Thus despite its bright-line rule that appears applicable on its face, *Potts* is not an entirely analogous set of circumstances.

{¶82} In *State v. Baker*, 12th Dist. Warren No. CA2009-06-079, 2010-Ohio-1289, the Twelfth District Court of Appeals addressed a situation wherein a trial court failed to hold an evidentiary hearing on a motion to quash, but the case proceeded (without an interlocutory appeal) with the defendant ultimately pleading no contest to OVI. *Baker* at ¶ 23. The defendant was convicted and he appealed, challenging a suppression issue and the trial court's failure to hold a hearing on the motion to quash. The court in *Baker* overruled the challenge to the suppression issue, but found that the trial court did err by failing to hold a *Potts* hearing on the motion to quash. The court in *Baker* then vacated the conviction and remanded the matter with instructions for the trial court to conduct a *Potts* hearing/*Nixon* analysis. *Id*. at ¶¶ 57-58. *Baker* stated that if the trial court still rendered the same decision after holding the *Potts* hearing and conducting the requisite *Nixon* analysis, the trial court could reinstate the conviction. *Id*. at ¶ 58.

{¶83} In *City of Olmsted Falls v. Bowman*, 8th Dist. Cuyahoga No. 102129, 2015-Ohio-2858, the Eighth District Court of Appeals went even further when the trial court failed to hold a *Potts* hearing or conduct a *Nixon* analysis. The court in *Bowman* held that a trial court could not apply the *Nixon* factors retrospectively, thus where an appellate court reversed for a *Potts* hearing on a motion to quash, the

conviction had to be vacated, even after a trial had been conducted, and the matter had to proceed from where the error occurred, effectively granting the defendant a new trial. *Bowman* at ¶¶ 15-19.

{¶84} Strictly reading *Potts*, *Baker*, or *Bowman*, these cases would seem to mandate reversal in this matter, regardless of any analysis of the actual record before us. However, a case from the Second District Court of Appeals, *Miamisburg v. Rinderle*, 2d Dist. Montgomery No. 26094, 2015-Ohio-351, provides a different alternative. In *Rinderle*, the appellant challenged the trial court's decision to quash a subpoena without a hearing. The trial court held brief arguments on the matter just before the beginning of trial, which the *Rinderle* court found could be enough to satisfy *Potts*. Nevertheless, the court in *Rinderle* stated,

> **But even if the trial court did err in failing to hold a hearing, the error was harmless because the subpoena plainly was improper. Rinderle's counsel asserted that he wanted to cross examine the prosecutor to be sure she had provided full discovery. (*Id.* at 7, 796 N.E.2d 915). In response, the prosecutor represented that she had made her "entire file" available to the defense. (*Id.* at 8–9, 796 N.E.2d 915). Defense counsel admitted having seen the file at least once. (*Id.* at 10, 796 N.E.2d 915). Under these circumstances, and absent *any* evidence to suggest that the prosecutor had violated her continuing obligation under Crim.R. 16, defense counsel had no right to cross examine the prosecutor for purposes of a "fishing expedition" or what the trial court characterized as "a shotgun accusation that maybe you haven't received all of the discovery." (*Id.* at 8, 796 N.E.2d 915).**

*Rinderle* at ¶ 20.

{¶85} *Rinderle* allows for the possibility that even where a *Potts* hearing/*Nixon* analysis was not conducted before quashing a subpoena, harmless error can be found if the subpoena was plainly improper. We feel this is the more logical application of the rule to the facts before us, particularly in a bench trial such as the one before us. While a hearing should be held under *Potts*, where the record demonstrates that subpoena plainly has no merit, and would have no impact on the trial whatsoever that *already occurred*, we will not go so far as to overturn the entire trial or remand the matter to the trial court to have a superfluous hearing. This is particularly true where this case does not involve an interlocutory or third-party appeal.

{¶86} In this case there simply was never any financial malfeasance alleged to justify a "fishing expedition" to find potential impeachable information of Katie and Aaron. At trial, the testimony indicated that there was no failure to pay for babysitting services at any point on behalf of Katie and Aaron and that they were not behind in their payments. There is absolutely no indication of a financial motive in this matter whatsoever. To the extent that Katie and Aaron's finances were relevant at all in this matter, defense counsel was able to cross-examine Aaron as to his business earnings at the December 6, 2018 hearing. Katie and Aaron were also available for cross-examination regarding their payments to the Bennetts at trial, or their financial status in general. However, a trial court could readily find that

extrinsic evidence used for impeachment purposes was inadmissible or irrelevant, particularly if it pertained to anything other than a prior inconsistent statement.

{¶87} Moreover, we note as to the relevancy of the request for tax records, Evid.R. 807 refers to the motive of the *child* in making a disclosure of sexual activity *not* the motive of the narrator of the child's statement. Thus the narrator's credibility—Katie and Aaron in this case—and any relevance of financial tax returns, is addressed under a general evaluation of the narrator's testimony at trial and the corresponding rules of impeachment. This would include the rules pertaining to collateral impeachment.

{¶88} Under these specific factual circumstances, including the fact that the trial judge considering the ruling on collateral impeachment also serves as the trier-of-fact in weighing the totality of the evidence, we decline to find reversible error. Therefore, Bennett's fourth assignment of error is overruled.

*Conclusion*

{¶89} For the foregoing reasons Bennett's assignments of error are overruled and the judgment of the Wyandot County Common Pleas Court is affirmed.

***Judgment Affirmed***

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**