[Cite as *State v. Dodridge*, 2025-Ohio-2856.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 22CA19 |
| | : | |
| v. | : | |
| | : | DECISION AND |
| RICHARD B. DODRIDGE, | : | JUDGMENT ENTRY |
| | : | |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

Karyn Justice, The Law Office of Karyn Justice, LLC, Portsmouth, Ohio, for Appellant.

Brigham M. Anderson, Lawrence County Prosecuting Attorney, and Andrea M. Kratzenberg, Assistant Lawrence County Prosecuting Attorney, Jackson, Ohio, for Appellee.

_____

Smith, P.J.

{¶1} Appellant, Richard Dodridge, appeals from the judgment of the Lawrence County Court of Common Pleas convicting him of one count of domestic violence, a first-degree misdemeanor in violation of R.C. 2919.25(A), and one count of disrupting public services, a fourth-degree felony in violation of R.C. 2909.04(A)(1). On appeal, Dodridge raises eight assignments of error contending that 1) the trial court abused its discretion when it allowed the State to question the victim as a hostile witness; 2) the trial court abused its discretion

when it improperly questioned the victim; 3) the trial court abused its discretion when it admitted portions of the police report into evidence; 4) the trial court erred when it did not instruct the jury regarding impeachment evidence; 5) defense counsel was ineffective for failing to object to the jury instructions or request a limiting instruction; 6) the State violated his right to due process when it failed to preserve materially exculpatory evidence that had been requested in discovery; 7) the trial court erred when it denied his motion for acquittal; and 8) the cumulative effect of these errors deprived him of a fair trial.

{¶2}  However, because we find no merit in any of the arguments raised in support of Dodridge's eight assignments of error, they are all overruled. Accordingly, the judgment of the trial court is affirmed.

## FACTS

{¶3}  On May 25, 2022, Dodridge was indicted on one count of domestic violence, a first-degree misdemeanor in violation of R.C. 2919.25(A), and one count of disrupting public services, a fourth-degree felony in violation of R.C. 2909.04(A)(1).  The charges stemmed from an incident that occurred at Dodridge's residence in Ironton, Ohio on February 28, 2022.  Preceding the filing of the indictment, a criminal complaint was filed by the prosecuting attorney with an attached criminal affidavit from one of the officers that responded to Dodridge's residence on the night of the incident.  The affidavit stated that the Ironton Police

Department and Child Protective Services (hereinafter "CPS") went to the

residence to conduct a well-being check after being informed that a domestic

violence incident had taken place during the night. Sergeant McKnight, the

averring officer, stated that he arrived, along with Captain Gue, Detective Pauley,

Detective McGraw, and CPS.

{¶4} Sergeant McKnight identified the victim as Megan Eaches, the wife of

Dodridge. The victim informed McKnight that Dodridge had a headache and

became agitated when the baby was crying at approximately 2:00 a.m. The

affidavit stated that the victim informed McKnight that Dodridge grabbed her by

the hair and pushed her to the ground as she was trying to take a bottle into the

baby's room. The affidavit further stated that when the victim went to get her

phone to call 911, Dodridge took her phone and tried to break it in half. At that

point, the victim went to the car, where Dodridge followed her and threatened to

take the kids. When the victim went back inside, Dodridge pushed the victim to

the floor in the bedroom and proceeded to kick and punch her. The affidavit states

that the victim explained that Dodridge left when she told him she saw police

lights. The affidavit further referenced that a statement was obtained from the

victim and that photographs of the victim's injuries were taken. Despite the fact

that this affidavit stated that the victim wished to pursue criminal charges, it is

clear that soon after filing the complaint and throughout the jury trial, the victim

made it clear that she did not want to pursue charges against Dodridge and that the couple remained together after the incident.

{¶5}  Dodridge filed a demand for discovery on March 23, 2022 while the case was still pending in the Ironton Municipal Court.  Video and audio tape recordings were requested but were not provided when the State responded to discovery on March 28, 2022.  The case was bound over to the grand jury and the matter proceeded through discovery.  A motion to compel evidence, as well an amended motion to compel, were filed on October 5, 2022.  The amended motion sought "all body worn camera footage and the body worn camera policy from the Ironton Police Department Officers involved in the investigation of this case."  The motion requested "all unedited or undestroyed footage."

{¶6}  The motion stated that after Dodridge waived his right to a preliminary hearing on the felony offense and was indicted by the grand jury, a second demand for discovery, identical to the demand filed in the municipal court, was filed in the common pleas court on June 30, 2022.  The State filed an answer to that discovery request on August 2, 2022, but did not produce any body cam footage.  A pretrial hearing was held on August 10, 2022 and the State indicated that it would provide the requested footage.  Another pretrial hearing was held on August 17, 2022, where the State again indicated that it would provide the requested footage and this pattern was again repeated at another pretrial hearing held on September 7, 2022.

The next day, the prosecutor's office informed defense counsel that there was no body cam footage because the footage is "purged after 180 days if not marked as evidence."

{¶7}  A hearing on the amended motion to compel was held on October 18, 2022.  Ironton Police Chief Pam Waggoner testified on behalf of the State and explained that the police department contracts with a third party who retains data for the department for 180 days, at which time data is purged, unless it is marked as evidence.  She testified that Captain Gue's body cam was not activated during the investigation and that Sergeant McKnight's body cam was only activated for one minute and forty-nine seconds during the incident.  She explained that the body cams also act as cameras and that they stop recording when photos are being taken.

{¶8}  The trial court questioned Waggoner during the hearing and established that 1) the indictment was filed on May 25, 2022; 2) a discovery demand was filed on June 30, 2022; and 3) the State answered discovery on August 2, 2023, which was prior to the 180-day purge deadline on August 27, 2023.  Thus, per Chief Waggoner, if there was actually footage from Sergeant McKnight's body cam, it should have been able to be retrieved prior to August 27, 2022.  However, Chief Waggoner also testified that there may have been no video at all, but rather, only the photos that were taken from the camera.  She testified

that the only way to know for sure would be to pull the footage, which was no longer available.

{¶9} Sergeant McKnight also testified during the hearing. He testified that he recorded the interaction with the victim when he responded to the scene and that he did not know why there was only one minute forty-nine seconds of footage. He testified that he used his body cam to take photos of the victim and to receive photos that were sent via text message from the victim. He explained that in the past, including when this incident took place, evidence such as this was handled by the detectives, not the officers. He further explained that beginning about a month prior to the hearing the process was changed to require each officer to download any footage taken to a CD and attach to the police report.

{¶10} The victim also testified at the hearing. She testified that Captain Gue and a CPS worker told her that her children would be taken away from her if she didn't go along with what her step-daughter and her step-daughter's mother had reported to the police.[1] She testified that she would not have a made a statement had Gue not threatened her with taking her children, however, she also testified that what her step-daughter had told the police was accurate, that Gue's and CPS's threats did not coerce any untruthfulness out of her in giving her

---

[1] As will be discussed in more detail below, Dodridge's daughter (the victim's step-daughter) was present in the home and witnessed a portion of the incident. She went to school the next morning and informed her guidance counselor of the incident. As a result, her mother was called and then Dodridge's daughter, along with her mother, reported the matter to police, who then called CPS.

statement, and that she had told the truth when providing her statement to the police. She testified that she did not remember any interaction with Sergeant McKnight during the incident, however, she was able to identify several of the photos that were taken. Specifically, she identified a photo of her own hand that was taken by her, as well as photos of her from behind that her step-daughter took, which included a photo depicting a bruise on her scapula.

{¶11} The photos were admitted over the objection of the defense, with the court confirming with the victim that all of the photos did indeed depict her body on February 28, 2022, and her agreement that the photos were an accurate description of how she looked after the incident. The trial court ultimately denied the motion to compel because there was no evidence that could be provided at that time, as the footage requested no longer existed.

{¶12} The matter then proceeded to a jury trial on November 9, 2022. The State called two witnesses: the victim and Dodridge's daughter. The victim reluctantly testified, stating that she was subpoenaed to be there and did not want to testify. She testified that an incident occurred on February 28, 2022 when the couple's baby was crying. She explained that Dodridge came up behind her, grabbed her to make her look at him, and that when she pulled away from him, her hair got caught and she fell down. She testified that her ear was also injured during this exchange. She testified that when she tried to go to the car, Dodridge grabbed

her keys and phone and they "wrestled" over them, resulting in a scratch to her thumb. She further testified that when she went back to the bedroom where their child was in bed asleep, Dodridge grabbed her again, threw her down, kicked her and hit her. She testified that it was at that point that her step-daughter came upstairs. She testified that she wanted to call the police just so that Dodridge would leave, but that she couldn't because he had her cell phone. The victim identified several photos, including a photo of her injured finger that was taken by her, a photo of a bruise on her back that was taken by her step-daughter (which she claimed for the first time might have occurred as a result of her car hitting her some days prior), and two photos depicting what appeared to be a rug burn to her forehead and a mark on the side of her face, also taken by her step-daughter. She also identified a photo showing a scratch behind her ear that was taken by step-daughter, and a photo showing a large amount of hair that she stated came out when she took her hair down after the incident. She explained that her step-daughter took the photos a few hours after the incident so she could see them, and that the photos accurately depicted what she looked like at that time.

{¶13} However, on cross examination, the victim testified that she didn't feel she needed to call 911 and made no effort to call 911, and that there was another phone in the house she could have used. She also testified that Dodridge did not rip her hair out and that she didn't believe that Dodridge was intentionally

trying to injure her. She testified inconsistently regarding some of the photos she had been presented with on direct examination, claiming that she didn't know if some of the injuries actually occurred that night, or whether they may have occurred on a different date, specifically with respect to bruising on her arm, her scapula, and a mark on her head.

{¶14} On re-direct examination, the State tried to clarify her testimony regarding the photo of the hair in the sink, to which the victim responded that it just fell out. The victim then agreed that it was not a normal amount of hair to lose and that it had to be from the incident. The victim then testified that she wasn't sure whether the photo depicting what appeared to be a rug burn on her forehead actually occurred the night of the incident or not. When the State asked her why she had taken photos of her injuries if she wasn't sure they had actually occurred that night, the defense objected, arguing that the State was trying to impeach its own witness. At that point, the State asked the court to declare the victim to be a hostile witness. The court, noting that the victim had changed her testimony from direct examination to cross examination, declared her to be a hostile witness.

{¶15} This declaration permitted the State to then ask the victim a series of leading questions and also resulted in the trial court directly interrogating the victim. The details of this questioning of the victim will be fully discussed below as part of our analysis under Dodridge's first, second, and third assignments of

error.  However, by the time the questioning of the victim was concluded, the victim confirmed that Dodridge took her phone and tried to break it during the incident, that she had wanted to call 911 to get him to leave, but that she couldn't because he had her phone.

{¶16}  Dodridge's teenage daughter also testified on behalf of the State.  She testified that she woke up and heard Dodridge and her step-mother fighting at about 2:30 a.m. and then she went back to sleep.  She testified that she awoke again at 3:30 a.m. and went upstairs to find the victim on the floor in her bedroom while her dad was kicking and punching her.  She testified that she grabbed the couple's two little children and took them to the living room while the fight continued.  She testified that the victim came out of the bedroom and yelled for her to call 911, but that she couldn't because she had no phone.[2]  She testified that she went to call 911, but that her dad told her she couldn't because he had the victim's phone and there was no other phone in the house.  She testified that afterwards, the victim had marks all over her and that she took pictures of the injuries with the victim's phone because the victim asked her to do so.  She further testified that she went to the guidance counselor's office when she got to school the next day.

{¶17}  The State rested after introducing these two witnesses.  A discussion was held outside of the presence of the jury during which the parties discussed the

---

[2] The record indicates that Dodridge's daughter was being disciplined and had her phone taken away from her.

fact that the victim had been declared a hostile witness and they debated whether or not the victim had been impeached for purposes of being able to admit her prior written statement that was attached to the police report. The trial court ultimately determined that the written statement was admissible and offered that the defense could call the victim back to the stand to testify in its case-in-chief and would be permitted to liberally question her; however, the record reveals that the defense chose not to do this when the time came. Defense counsel thereafter made a Crim.R. 29(A) motion for judgment of acquittal as to the disrupting public services charge, which was ultimately denied by the trial court.

{¶18} Dodridge chose to testify on his own behalf. He testified that there had been a verbal argument on the night in question and that although voices were raised, the argument did not get physical. He testified that the bruise on the victim's scapula occurred when her car door hit it the week prior to the incident. He testified that the victim's ear was injured as a result of one of the children throwing an iPad while in bed. He testified that he did not touch the victim's phone that night.

{¶19} He essentially explained that things were tense between him and his wife due to the fact that he had had an affair with a co-worker while working for a previous employer, Necco. He also testified that neither his wife nor his daughter were happy with their living arrangements and that they both wanted the daughter

to go live with her mother. He claimed that the victim had previously stated that if he was charged with domestic violence, then his daughter wouldn't be able to come back to their house and that she didn't want her there. When asked by the State during cross-examination whether he had ever been disciplined while working at Necco, he answered that he had not. The State then impeached him by introducing a "Notice of Investigative Restriction" form that was signed by him, stating that he was required to work in the line of sight of another staff member when working with a certain individual. The exhibit was admitted into evidence over the objection of the defendant.

{¶20} The jury found Dodridge guilty of both charges contained in the indictment. The trial court sentenced him to 180 days in jail on the domestic violence count and a 30-month term of community control on the disrupting public services count. Dodridge was also required to complete, as part of his sentence, an alcohol and drug treatment program, an anger management program and 200 hours of community service. He was further ordered to wear a SCRAM monitor for six months after completion of his jail sentence. It is from this judgment that Dodridge now appeals, setting forth eight assignments of error for our review.

ASSIGNMENTS OF ERROR

I.    THE COURT ABUSED ITS DISCRETION WHEN IT ALLOWED THE STATE TO QUESTION MRS. DODRIDGE-EACHES AS A HOSTILE WITNESS.

II.     THE COURT ABUSED ITS DISCRETION WHEN IT IMPROPERLY QUESTIONED MRS. DODRIDGE-EACHES.

III.    THE COURT ABUSED ITS DISCRETION WHEN IT ADMITTED PORTIONS OF THE POLICE REPORT INTO EVIDENCE.

IV.    THE COURT ERRED WHEN IT DID NOT INSTRUCT THE JURY REGARDING IMPEACHMENT EVIDENCE.

V.     MR. DODRIDGE'S COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE JURY INSTRUCTIONS OR REQUEST A LIMITING INSTRUCTION.

VI.    THE STATE VIOLATED MR. DODRIDGE'S RIGHT TO DUE PROCESS WHEN IT FAILED TO PRESERVE MATERIALLY EXCULPATORY EVIDENCE THAT HAD BEEN REQUESTED IN DISCOVERY.

VII.   THE COURT ERRED WHEN IT DENIED MR. DODRIDGE'S MOTION FOR ACQUITTAL.

VII.   THE CUMULATIVE EFFECT OF THESE ERRORS DEPRIVED MR. DODRIDGE OF A FAIR TRIAL.

ASSIGNMENT OF ERROR I

{¶21} In his first assignment of error, Dodridge contends that the trial court abused its discretion when it allowed the State to question the victim as a hostile witness. Dodridge argues that the victim, from the time of the incident until the trial, consistently told the State that she did not want the matter prosecuted. Dodridge further argues that the State failed to allege surprise or affirmative

damage, which he claims was required in order for the victim to be declared a hostile witness.  In response, the State argues that because the victim's testimony on cross-examination differed from her testimony on direct-examination, and also contradicted her written statement provided to the police at the time of the incident, that the trial court did not abuse its discretion in allowing the State to treat her as a hostile witness.

Standard of Review

{¶22}  Evid.R. 611 governs the mode and order of interrogation of witnesses, and it provides in section (C) as follows:

> Leading Questions.  Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony.  Ordinarily leading questions should be permitted on cross-examination.  When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

" 'Evid.R. 611(C) does not preclude the use of leading questions on direct examination; instead, the rule provides that "it is within the trial court's discretion to allow leading questions on direct examination." ' " *State v. Pickett*, 2016-Ohio-4593, ¶ 45 (4th Dist.), quoting *State v. Williams*, 2016-Ohio-733, ¶ 34 (4th Dist.), in turn quoting *State v. Jackson*, 92 Ohio St.3d 436, 449 (2001).  *See also State v. Jarrells*, 2014-Ohio-2816, ¶ 62-63 (4th Dist.).

{¶23}  Furthermore, this Court has held that "[a] trial court's decision on whether to declare a witness hostile is a matter within its sound discretion." *State*

*v. Smith*, ¶ 23 (4th Dist.) (also observing that "[a] trial court does not abuse its discretion in finding that a wife-victim of domestic abuse who denies her initial statements to police that the husband-defendant inflicted physical harm on her is a hostile witness to the State"), citing *Ramage v. Central Ohio Emergency Services, Inc.*, 64 Ohio St.3d 97, 111 (1992).  *See also Cleveland Heights v. Reed*, 1995 WL 601126, *2 (8th Dist. Oct. 12, 1995) ("When a witness demonstrates hostility during direct examination by changing testimony significantly from that which counsel had good reason to expect, he was traditionally subject to leading questions.").  "The term 'abuse of discretion' connotes more than an error of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable."  *State v. Bennett*,  2024-Ohio-4557, ¶ 40 (4th Dist.), citing *Wilmington Steel Prod., Inc. v. Cleveland Elec. Illum. Co.*, 60 Ohio St.3d 120, 122 (1991).  "When applying the abuse-of-discretion standard of review, appellate courts are not free to merely substitute our judgment for that of the trial court."  *Bennett, supra*, citing *In re Jane Doe 1*, 57 Ohio St.3d 135, 137-38 (1991), in turn citing *Berk v. Matthews*, 53 Ohio St.3d 161, 169 (1990).

                              Legal Analysis

{¶24}  As set forth above, Dodridge contends that the trial court abused its discretion in allowing the State to treat the victim as a hostile witness without a showing of surprise and affirmative damage.  Dodridge argues that a hostile

witness "is one who surprises the calling party at trial by turning against him while testifying," stating that the "traditional 'hostile witness' is addressed under Evid.R. 607." However, in *State v. McKelton*, 2016-Ohio-5735, ¶ 152, the Supreme Court of Ohio observed that "[a] hostile witness is one who is so evasive or uncooperative on examination that his testimony is impeded."

Evid.R. 607 governs impeachment and provides in section (A) as follows:

> Who May Impeach. The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid.R. 801(D)(1)(a), 801(D)(2), or 803.

The Sixth District Court of Appeals was presented with an argument that a showing of surprise and affirmative damage was required in order to ask a hostile witness leading questions. *State v. Dolce*, 92 Ohio App.3d 687, 703-704, (6th Dist. 1993). In response, that court reasoned as follows:

> Appellant has confused Evid.R. 611(C) with Evid.R. 607, which addresses who may impeach and allows a party to impeach its own witness only upon a showing of surprise and affirmative damage. The state did not attempt to impeach [its witness], but simply wanted the opportunity to ask her leading questions upon redirect examination.

*Id.*

{¶25} However, five years later, this Court stated that " 'Evid.R. 607 requires a "showing of surprise and affirmative damage" before the court is

authorized to declare a witness hostile.' " *State v. Lemaster*, 1998 WL 27937, * 14

(4th Dist. Jan 27, 1998), quoting *State v. Holmes*, 30 Ohio St.3d 20, 23 (1987).

Despite the fact that this Court relied on authority from the Supreme Court of Ohio

in making this statement, we find this to be an incorrect application of the Rules of

Evidence.  A plain reading of the rules provides that a trial court has discretion to

permit a hostile witness to be asked leading questions on direct examination.

Evid.R. 611.  However, a trial court may only permit a hostile witness to be

impeached by means of a prior inconsistent statement "upon a showing of surprise

and affirmative damage."  Evid. R. 607(C).  Thus, a witness may be declared

hostile, defined in *McKelton* as being "so evasive or uncooperative on examination

that his testimony is impeded," under Evid.R. 611 for purposes of allowing leading

questions.  This may be done without going the extra step of actually impeaching

the witness, which clearly requires a showing of surprise and affirmative damage

under Evid.R. 607(C).

{¶26}  Nevertheless, assuming arguendo that a showing of surprise and

affirmative damage are required in order for a witness to be declared hostile, thus

permitting the calling party to ask the witness leading questions, we conclude such

a showing is evident in the record.  As explained in *State v. Smith, supra*:

> The existence of "surprise" concerning prior inconsistent
> statements is a decision within the sound discretion of the trial
> court.  *State v. Diehl* (1981) 67 Ohio St.2d 389, 391, 423 N.E.2d
> 1112; *State v. Reed* (1981) 85 Ohio St.2d 117.  Surprise exists if

the witness's trial testimony is "materially inconsistent" with a prior statement, and counsel lacked an "express forewarning" from the witness of his or her intent to recant or repudiate the prior statement. *State v. Wisebaker* (Aug. 8, 1996), Pike App. No. 96CA567, citing Reed at 125; *State v. Blair* (1986) 34 Ohio App.3d 6, 516 N.E.2d 240. A trial court does not abuse its discretion in finding that the prosecution was surprised when it was aware of a possibility that its witness may change his story but there is no express notice by the witness that he "would wholly deny his prior statement to the police officers", by the witnesses' testimony differing from his prior statement to police. *State v. Lewis* (1991), 75 Ohio App.3d 689, 696, 600 N.E.2d 764.

If a witness's testimony is inconsistent with the prior statements and also contradicts, denies, or harms the party's trial position, there is affirmative damage for purposes of Evid.R. 607. *Wisebaker*, citing *State v. Stearns* (1982), 7 Ohio App.3d 11, 15, 454 N.E.2d 139.

*Smith* at ¶ 55-56.

{¶27} A review of the jury trial transcript reveals that the victim testified on direct examination that, among other things, Dodridge grabbed her, causing her to fall and pull her hair, that he took her phone and keys, and that he proceeded to throw her to the ground and hit and kick her. She testified that she wanted to call the police, but that she couldn't because Dodridge had her phone and there was no other phone in the house. Later, on cross-examination, the victim testified that she didn't feel she needed to call 911, had no intention of calling 911, and that there was another phone in the house she could have used had she wanted to call 911. With regard to her hair, she testified that her hair simply got caught when she was walking away from Dodridge.

{¶28} On re-direct, the State asked follow-up questions related to the photo of a large wad of her hair in the sink. The victim basically testified that the hair just fell out when she took her hair down after the incident, seeming to suggest that the photo of the hair in the sink was depicting normal hair loss. The State then showed her a photo depicting a burn on her forehead, to which she responded that she was not sure that the injury was caused during the incident. The State then inquired as to why she had taken the photo if she wasn't sure it had occurred that night. At that point, the defense objected and the State informed the court that it believed the victim was a hostile witness. The court, noting that the victim's story had changed several times, declared her to be a hostile witness. The defense again objected, arguing that no surprise had been shown. The trial court overruled the objection and the State then continued its re-direct examination of the victim through leading questions, attempting to obtain testimony from the victim that was consistent with her prior statement given to law enforcement, and also consistent with her prior testimony during the hearing on the motion to compel discovery.

{¶29} Thus, the record clearly demonstrates that the victim was not only inconsistent, uncooperative and evasive on the witness stand as to the origin of her injuries, as well as whether or not Dodridge prevented her from calling for help on the night of the incident, but this testimony surprised the State and the inconsistency caused affirmative damage. Although the victim was a reluctant

witness and made it clear that she did not want the case to go forward, she had, on prior occasions testified that the contents of the statement she provided to the police was true and accurate. Therefore, the departure in her testimony on cross-examination by the defense was clearly unexpected and resulted in surprise and affirmative damage. Based upon the foregoing, we cannot conclude that the trial court abused its discretion in initially declaring the victim to be a hostile witness and permitting the State to ask her leading questions. Accordingly, we find no merit to the arguments raised under Dodridge's first assignment of error and it is overruled.

## ASSIGNMENT OF ERROR II

{¶30} In his second assignment of error, Dodridge contends that the trial court abused its discretion when it improperly questioned the victim. Dodridge argues that the trial court interjected itself and questioned the victim while the State was conducting re-direct and that the court's questioning was not done in an impartial manner. More specifically, Dodridge argues that the trial court's questioning violated his right to a fair trial because the court's statements indicated "that it anticipated [an] outcome and 'steered' the proceedings when it interjected during the State's questioning." Finally, Dodridge contends that the trial court "actively assisted the State in its effort to impeach [the victim's] credibility."

{¶31} The State responds by arguing that Evid.R. 614 granted the trial court discretion to interrogate witnesses and also requires that the defense object to the questioning in order to preserve the error for appeal. The State contends that the trial court's questions did not indicate any bias and was only done in an attempt to refresh the victim's recollection. The State further contends that because defense counsel did not object to the trial court's interrogation of the victim, that the claimed error has been waived.

Standard of Review

{¶32} Evid.R. 614 governs the calling and interrogation of witnesses by the court and provides in section (B) that "[t]he court may interrogate witnesses, in an impartial manner, whether called by itself or by a party." It further provides in section (C) that "[o]bjections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present." In *State v. Davis*, 79 Ohio App.3d 450, 454 (4th Dist. 1992), this Court explained as follows:

> During a trial, the judge may, in the interest of justice, act impartially in developing facts germane to an issue of fact to be determined by the jury. *Lodi v. McMasters* (1986), 31 Ohio App.3d 275, 31 OBR 603, 511 N.E.2d 123. The court, in questioning a witness pursuant to Evid.R. 614(B), may not indicate by its intensity, tenor, range and persistence the court's opinion of a witness's credibility or the sufficiency of the testimony. *See, e.g., State v. Hicks* (Aug. 16, 1991), Lucas App. No. L-83-074, unreported, 1991 WL 156534, citing *State ex rel.*

> *Wise v. Chand* (1970), 21 Ohio St.2d 113, 50 O.O.2d 322, 256
> N.E.2d 613, paragraph four of the syllabus.

"We review a trial court's interrogation of witnesses for an abuse of discretion."

*State v. Smith, supra*, at ¶ 34, citing *State v. Davis*, at 454.

Legal Analysis

{¶33} In response to the State's contention that Dodridge has waived any argument related the to the trial court's questioning of the victim because he did not raise an objection at trial, Dodridge argues in his reply brief that he did, in fact, object at the first opportunity outside the presence of the jury, as required by Evid.R. 614(C). He alternatively argues that the trial court's questioning of the witness in the manner that it did constituted plain error.

{¶34} A review of the trial transcript confirms that no objection was made by the defense when the trial court began questioning the victim. Furthermore, at the next opportunity outside the presence of the jury, although the defense lodged an objection to the admission of the police report being admitted as an exhibit for purposes of impeachment, it did not object to the trial court's questioning of the victim. In fact, defense counsel stated that it had no problem with the use of the victim's prior statement to refresh her recollection, which the transcript demonstrates was the trial court's goal in questioning her. Thus, we conclude that this argument has been waived for purposes of appeal, with the exception of a plain error review.

{¶35} An appellate court " 'will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.' " *State v. Awan*, 22 Ohio St.3d 120, 122 (1986), quoting *State v. Childs*, 14 Ohio St.2d 56 (1968), paragraph three of the syllabus. Appellate courts may, however, consider a forfeited argument using a plain-error analysis. *State v. Shields*, 2023-Ohio-2331, ¶ 72 (4th Dist.). Crim.R. 52(B) states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." It is the defendant's burden to "establish that an error occurred, it was obvious, and it affected his or her substantial rights." *State v. Fannon*, 2018-Ohio-5242, ¶ 21 (4th Dist.) "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶36} As set forth above, Evid.R. 611 governs the mode and order of the interrogation of witnesses and the presentation of evidence. As discussed above, although Evid.R. 611(C) permits the trial court to declare a witness to be a hostile witness and permits the calling party to cross-examine its own witness, Evid.R. 611(A) also provides that the trial court may question a witness, as follows:

> Control by Court. The court shall exercise reasonable control
> over the mode and order of interrogating witnesses and

> presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

To those ends, as set forth above, the rules of evidence also provide that a court may, in its discretion and within certain parameters, interrogate witnesses.

{¶37} Here, a review of the trial transcript demonstrates that shortly after the court declared the victim to be a hostile witness, and after the State cross-examined the victim with a series of questions that appeared to be leading to an impeachment of the victim by virtue of the State's request that the victim be ordered to read her prior written statement that was attached to the police report into the record in front of the jury, the trial court intervened. The trial court did state, in front of the jury, that the State was "getting into impeachment." At that juncture, the trial court stopped the State's questioning and directed the victim to read her prior written statement, to herself and not to the jury, in order to refresh her recollection. The court then briefly questioned the victim, asking her if she could confirm that the prior written statement was made by her and whether any of her testimony in court that day had unintentionally differed from her prior statement. In response, the victim stated that "If I said that he didn't have my phone and try to break it – that was unintentional." The court then asked the victim if she was now correcting her testimony, and the victim affirmed that she

was.  At that point, the State continued with its re-direct of the victim.  The victim, from that point forward, testified consistently with her prior written statement.

{¶38}  Based upon the foregoing, we cannot conclude that the trial court's decision to interrogate the witness or that the manner in which the court interrogated the witness resulted in plain error.  Rather, we conclude that the trial court's questioning of the victim was conducted in an impartial manner in an effort to develop the facts germane to the issues before the jury, and in order to avoid undue embarrassment to the victim that would have occurred had she been impeached by the State in front of the jury.  As stated by the trial court later in the transcript, outside the presence of the jury:

> COURT:     So, I want to make the record clear on this.  We got into a little bit in front of the jury, but didn't want to get too deep.  So, police reports don't come into evidence.  They can come in, I think, under certain exceptions when they're offered for impeachment purposes. Definitely are able to use to refresh recollection.  That's what I was steering that toward and steering it away from reading it into the record and admission.  The problem is, is we've had her in here before, under oath, sworn to testify, what that report in her hand, and she testified, 'That is my words.'  Now, she said she didn't want to write it, and I think it was Gue that was standing over her and said you write it or we're taking the kids based on what Child Protective Services' said.  So, we know that whole story, but the essence of it was she has testified in this courtroom, on this stand, under oath, that those are her own words in her report.  She testified directly opposite of some of the things that she said, subjecting herself to, at best, false swearing.  At worst, perjury, in Court.  I don't want to see that happen to any witness, especially we know the sympathy factor in here, because she's been adamant from day one, she didn't want this case to go where it's going.  So, part of what I

was doing was deflecting that to get it in without having an admission right then of the entire report and all the content, but I did want her to refreshing [sic] her recollection. And I think she cured some of those issues.

The court went on to explain that although the victim's prior written statement, which was appended to the police report, had been marked for identification purposes, it was going to defer ruling on the admission of the document, explaining that "in the four corners of the rule for impeachment, that document was used to impeach her testimony, but I gauged it as a refresh of recollection." The court further stated that "I wanted the record to be clear for appeal purposes, whomever has the right to appeal in this case, why I did what I did."

{¶39} In *State v. Smith, supra*, the trial court "interrupted and repeatedly tried to get" one of the victims to repeat the conversation she had with another victim while traveling to the police station on the day of the incident. *Smith* at ¶ 38. In *Smith*, no objection had been made to the court's questioning and this Court was reviewing the argument under a plain error standard. *Id.* We determined that because the conversation between the victims was "germane to an issue of fact, i.e. whether [the victims] fabricated their statements to the police[,]" the trial court "acted impartially in developing the facts." *Id.* at ¶ 39.

{¶40} In *Andrew v. Power Marketing Direct, Inc.*, 2012-Ohio-4371, ¶ 78 (10th Dist.), another case involving a plain error review of a trial court's questioning of witnesses at trial, the court observed that "[a] trial court is obligated

to control the proceedings before it, to clarify ambiguities, and to take steps to ensure substantial justice." Citing *Brothers v. Morrone-O'Keefe Dev. Co., LLC*, 2006-Ohio-1160, ¶ 10 (10th Dist.). The court stated that "[a]ccordingly, a trial court should not hesitate to pose pertinent and even-handed questions to witnesses." *Id.* The court further observed as follows:

> Evid.R. 614(B), however, requires the court to question impartially and thus tempers a trial court's ability to question a witness. *Brothers* at ¶ 12. If the trial court's questions can reasonably indicate to the jury the court's opinion of the witness's credibility or the weight to be given that witness's testimony, the questions are prejudicially erroneous. *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113, 256 N.E.2d 613 (1970), paragraph four of the syllabus. "[A]bsent ' "any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court acted with impartiality [in * * * [its] questions from the bench] in attempting to ascertain a material fact or to develop the truth." ' " *Brothers* at ¶ 12, quoting *State v. Baston*, 85 Ohio St.3d 418, 426, 709 N.E.2d 128 (1999), quoting *Jenkins v. Clark*, 7 Ohio App.3d 93, 98, 454 N.E.2d 541 (2d Dist.1982). "A trial court's questioning of a witness is not impartial merely because it elicits evidence that is damaging to one of the parties." *Brothers* at ¶ 12, citing [*Klasa v. Rogers*, 8th Dist. No. 83374, 2004-Ohio-4490, at ¶ 32].

*Id.* at ¶ 79

{¶41} We cannot conclude, based upon the foregoing, that the trial court's questioning of the victim resulted in plain error. As noted above, the record does not support the argument that the trial court questioned the witness impartially or that its questioning assisted in the State's attempt to impeach its own witness. Instead, the record demonstrates that the trial court intervened in the State's re-

direct examination of the victim in order to control the proceedings, prevent the victim's prior inconsistent statement from being read into evidence in front of the jury, and to try to clarify the victim's testimony in a search for the truth. Thus, we find no merit to the arguments raised under Dodridge's second assignment of error. Accordingly, it is overruled.

ASSIGNMENT OF ERROR III

{¶42} Dodridge contends in his third assignment of error that the trial court abused its discretion when it admitted portions of the police report into evidence. More specifically, Dodridge argues that the trial court erred by delaying ruling on the admission of the victim's statement, which was attached to the police report, because it prevented him from being able to cross-examine the victim regarding the statement while she was testifying. He further argues that the trial court erred in allowing the State to read portions of the victim's statement during closing arguments, and also erred in ultimately admitting the statement as an exhibit. Dodridge also argues that the trial court abused its discretion in admitting a disciplinary report related to an incident that occurred at his previous employment with Necco.

{¶43} The State responds by arguing that the victim's prior statement was admitted as evidence of a prior inconsistent statement offered for impeachment purposes and points out that the police report itself was not admitted as an exhibit.

The State further argues that even if the admission of the statement was error, it was harmless error. The State also argues, with respect to the admission of the Necco report, that the report was admitted for impeachment purposes and that Dodridge opened the door for questioning on this topic when he denied that he was ever disciplined while employed at Necco.

## Standard of Review

{¶44} " 'A trial court has broad discretion in the admission or exclusion of evidence, and so long as such discretion is exercised in line with the rules of procedure and evidence, its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to defendant.' " *State v. Jones*, 2021-Ohio-2601, ¶ 49 (4th Dist.), quoting *State v. Ward*, 2003-Ohio-5650, ¶ 32 (4th Dist.), in turn citing *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991). " '[T]rial witnesses may be impeached pursuant to Evid.R. 613(B) through the use of their *own* prior inconsistent statements.' " (Emphasis added.) *Jones* at ¶ 49, quoting *State v. Byrd*, 1998 WL 2403, *2 (4th Dist. Jan. 6, 1998), citing *State v. Hill*, 75 Ohio St.3d 195, 207 (1996).

## Legal Analysis

{¶45} Evid.R. 613 governs impeachment by self-contradiction. Evid.R. 613(A) addresses the examining of a witness concerning a prior statement and states, regarding the prior statement itself, that "the statement need not be shown

nor its contents disclosed to the witness at that time, but on request the same shall

be shown or disclosed to opposing counsel." Evid.R. 613(B) addresses extrinsic

evidence of a prior inconsistent statement of a witness and states that extrinsic

evidence of a prior inconsistent statement by a witness is admissible if both of the

following apply:

> (1)    If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
>
> (2)    The subject matter of the statement is one of the following:
>
> (a)    A fact that is of consequence to the determination of the action other than the credibility of a witness;
>
> (b)    A fact that may be shown by extrinsic evidence under Evid.R. 608(A), 609, 616(A), or 616(B);
>
> (c)    A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rule of Evidence.

The Second District Court of Appeals has explained that:

> asking a witness about a prior inconsistent statement does not involve extrinsic evidence of that prior inconsistent statement. It is only when the party examining the witness wants to offer evidence of the prior inconsistent statement other than the witness's own acknowledgment of that statement that extrinsic evidence is involved and the requirements of Evid.R. 613(B) apply.

*State v Pierce*, 2011-Ohio-4873, ¶ 84 (2d. Dist.).

{¶46} This Court has previously addressed the admission of a prior inconsistent statement as extrinsic evidence under Evid.R. 613(B), explaining as follows:

> When extrinsic evidence of a prior inconsistent statement is offered into evidence under Evid.R. 613(B), " 'a foundation must be established through direct or cross-examination in which: (1) the witness is presented with the former statement; (2) the witness is asked whether he made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposing party is given an opportunity to interrogate the witness on the inconsistent statement.' " *State v. Mack*, 73 Ohio St.3d 502, 514-515, 653 N.E.2d 329 (1995), quoting *State v. Theuring,* 46 Ohio App.3d 152, 155, 546 N.E.2d 436 (1988); *State v. Schofield*, 4th Dist. Washington Nos. 01CA36, 02CA13, 2002-Ohio-6945, ¶ 134. When the proponent lays a proper foundation, the evidence does not relate to collateral matters, and the witness denies making the statement, the proponent may offer extrinsic evidence of the prior inconsistent statement. *Schofield* at ¶ 135.

*State v. Hall*, 2014-Ohio-2959, ¶ 35 (4th Dist.). *See also State v. Pierce, supra*, at ¶ 81.

{¶47} We have already detailed the victim's testimony above which led her to being declared a hostile witness and also resulted in her being interrogated by the court. After closely reviewing the record, we are not convinced that the victim was impeached by either the trial court or the State while she was testifying before the jury. As referenced above, the trial court declared the victim to be a hostile witness at the State's request, permitting the State to then ask the victim a series of leading questions. Then, when the State asked the victim to read her prior

statement to the jury and it looked like an impeachment of the witness was impending, the trial court intervened and asked the witness to refresh her recollection by reading her prior statement to herself. The trial court then gave her the opportunity to clarify and/or correct any "unintentional" testimony she had just given, particularly with respect to whether or not Dodridge had taken her cell phone and attempted to break it during the incident, which she did. The trial court then promptly turned the witness back over to the State for continued questioning. The trial transcript indicates that the victim was no longer uncooperative at that point and testified in accordance with her prior statement she made on the night of the incident.

{¶48} Thus, after refreshing her recollection, the victim's testimony came in line with what had been anticipated by the State and she did not deny making the prior statement. We cannot conclude, based upon the record before us, that the victim was actually impeached by her prior testimony. As explained in *State v. Pierce*, " '[i]f the witness admits making the conflicting statement, then there is no need for extrinsic evidence." *Pierce, supra*, at ¶ 82, quoting *State v. Harris*, 1994 WL 718227, 2d. Dist. Dec. 21, 1994). *See also State v. Johnson*, 2015-Ohio-5491 (2d. Dist.) ("If the witness admits making the conflicting statement, then there is no need for extrinsic evidence."). This brings us to a problem, however, because the trial court ultimately admitted the statement into evidence after it reasoned

itself to the conclusion that the victim had been impeached, and therefore the statement was permitted into evidence.

{¶49} It is unclear from the record why the trial court reached this conclusion, especially considering it went to great lengths to explain on the record, outside the presence of the jury, that it refreshed the victim's recollection rather than letting her be impeached with the statement. The court explained that this was done primarily so that the jury would not be tainted, and also because the statement at issue was part of a police report, which is hearsay for which no exception applies. As the court was reasoning through its decision on this issue, defense counsel pointed out to the court that the victim corrected her testimony. The State persisted that the written statement was admissible as an impeachment document and the trial court admitted it. It was marked as an exhibit and, as noted by Dodridge, the prosecutor read the victim's prior statement to the jury during his closing arguments.

{¶50} We conclude that, based upon the record before us, the trial court erred and abused its discretion in admitting the victim's prior written statement, which was part of the police report. However, because prior to admission of this extrinsic evidence the victim reluctantly testified that Dodridge did, in fact, take her phone and try to break it, which prevented her from calling 911, and also testified that Dodridge did cause a scratch to her finger and ear, that Dodridge

grabbed her resulting in her hair coming out, and then pushed her to the ground and proceeded to hit and kick her, the admission of the prior written statement constituted harmless error. This determination is bolstered by the fact that Dodridge's daughter also testified regarding the events of that evening. She testified that she heard arguing during the night and tried to go back to sleep. She awoke again to the sound of more arguing at which point she went upstairs to find the victim on the ground while Dodridge was punching and kicking her. She testified that the victim yelled for her to call the police, but that she couldn't because she didn't have a phone and there was no house phone. She testified that Dodridge told her she couldn't call because he had the victim's phone, and that she could see that Dodridge had a phone in each of his pockets. She further testified that the victim had marks all over her and that she took several photos of the victim at the victim's request once Dodridge left the house.

{¶51} Crim.R. 52(A) provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." An error is harmless when the error did not impact the verdict, the error was harmless beyond a reasonable doubt, and after excising the erroneously admitted evidence, the remaining evidence establishes the defendant's guilt beyond a reasonable doubt. *State v. Harris*, 2015-Ohio-166, ¶ 37 (2d Dist.). Additionally, "the admission of hearsay is harmless error where the declarant was also a witness and examined

regarding matters identical to those contained in the hearsay statements." *State v. Williams*, 2016-Ohio-322 ¶ 37 (2d Dist.).[3] Further, as recently noted in *State v. Sims*, in situations where admission of hearsay statements is merely cumulative to in-court statements and direct testimony, especially where the declarant was subject to cross-examination, such error is harmless beyond a reasonable doubt. *State v. Sims*, 2023-Ohio-1179, ¶ 71 (4th Dist.). *See also State v. Walker*, 2001 WL 1782885,*3-4 (5th Dist. Feb. 20, 2001) (finding the admission of a police report, absent a showing of surprise and affirmative damage, to be harmless beyond a reasonable doubt due to the overwhelming evidence of guilt). Walker involved the impeachment of a domestic violence victim by the State despite the State's admission that there was no showing of surprise or affirmative damage and no declaration that the witness was hostile. *Id.*

{¶52} Thus, although we have concluded that the trial court erred and abused its discretion in admitting the victim's prior statement, purportedly as extrinsic evidence used for impeachment purposes, we have also concluded that such error was harmless beyond a reasonable doubt as it was cumulative, and also because the remaining evidence in the record establishes Dodridge's guilt beyond a reasonable doubt.

---

[3] As set forth above, although the trial court did delay ruling on the admission of the prior statement, it issued its ruling admitting the statement prior to the start of Dodridge's case-in-chief and informed him that he could call the victim back to the stand and that he would be permitted to liberally question her regarding her prior statement. Dodridge, however, ultimately chose not to do so.

{¶53} Our analysis under this assignment of error cannot yet be concluded, however, because Dodridge also challenges the admission of a disciplinary report from his former employer, Necco. The transcript demonstrates that Dodridge chose to testify at trial and on cross-examination, he denied having ever been disciplined at work. The State impeached his testimony through the introduction of a "Necco Center Notice of Investigative Restriction" form which Dodridge had previously signed and which purportedly imposed some working restrictions with respect to a certain individual due to a pending investigation. We find this document was properly admitted as impeachment evidence and the trial court did not err or abuse its discretion in admitting it.[4]

{¶54} In light of the foregoing, we find no merit to the arguments raised under Dodridge's third assignment of error. Accordingly, this assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

{¶55} In his fourth assignment of error, Dodridge contends that the trial court erred when it did not instruct the jury regarding impeachment evidence. Dodridge argues that although the trial court admitted the victim's prior written statement and the Necco report, it did not instruct the jury to limit its deliberation

---

[4] Although Dodridge contends that this document was also part of a police report, a review of the record does not indicate this to be true. Instead, the document appears to be an internal Necco form.

of the exhibits to impeachment evidence for credibility purposes only and instruct them that the documents could not be considered as substantive evidence. Dodridge argues that this resulted in prejudice to him "as the State was then allowed to present the evidence for the truth of the matters asserted, violating [his] confrontation rights and right to due process and a fair trial." He further argues that the court had a duty to properly instruct the jury, "irrespective of whether counsel asked for a special instruction[,]" appearing to concede that there was no objection to the jury instructions below and urging a plain error review. The State responds by arguing that the outcome of the trial would not have differed had an impeachment instruction been issued and therefore, Dodridge was not denied a fair trial.

Standard of Review

{¶56} When reviewing errors in a jury instruction, a trial court must consider a jury charge as a whole. *State v. Huish*, 2023-Ohio-365, ¶ 54 (10th Dist.), citing *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 2015-Ohio-229, ¶ 35-36. However, "[a]n unnecessary, ambiguous, or even affirmatively erroneous portion of a jury charge does not inevitably constitute reversible error." *Id.* When a jury instruction incorrectly states the law, a reviewing court applies a mixed de novo and abuse of discretion standard of review, examining the jury charge as a whole and determining "whether the jury charge probably misled the jury in a

matter materially affecting the complaining party's substantial rights." *Id.* "A criminal defendant has the right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Howard*, 2007-Ohio-6331, ¶ 26 (4th Dist.). "[A] trial court should give a proposed jury instruction if it is a correct statement of the law and is applicable to the facts of the particular case." *Id.*, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991).

{¶57}  Dodridge concedes that counsel did not request a limiting instruction and urges that the trial court committed plain error in instructing the jury. "The Supreme Court of Ohio has found that an erroneous jury instruction does not meet the plain error threshold unless, ' "but for the error, the outcome of the trial clearly would have been otherwise." ' "  *State v. Brock*, 2024-Ohio-1036, ¶ 30 (4th Dist.), quoting *State v. McCown*, 2006-Ohio-6040, ¶ 38 (10th Dist.), in turn quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus; *State v. Cunningham*, 2004-Ohio-7007, ¶ 56, citing *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus. Courts ordinarily should take notice of plain error "with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *State v. Gardner*, 2008-Ohio-2787, ¶ 78; *State v. Patterson*, 2006-Ohio-1902, ¶ 13 (4th Dist.). A reviewing court should consider noticing plain error only if the error " ' "seriously affect[s] the fairness, integrity or

public reputation of judicial proceedings." ' " *Barnes* at 27, quoting *United States*

*v. Olano*, 507 U.S. 725, 736 (1993), in turn quoting *United States v. Atkinson*, 297

U.S. 157, 160 (1936). Therefore, we must determine whether the jury instructions

were confusing or misleading so as to have altered the outcome of the trial.

Legal Analysis

{¶58}  Dodridge contends that admission of the Necco report, along with the

admission of the victim's written statement provided to police, should have been

accompanied by a limiting instruction, but that they were not.  He argues that the

failure to provide a limiting instruction constituted plain error.  We agree that such

an instruction should have been provided.  However, for the same reasons that we

found the admission of the victim's prior written statement to be harmless error,

we cannot conclude that the trial court's failure to provide a limiting instruction

constituted plain error.

{¶59}  The record contains testimony by the victim, albeit given reluctantly,

that Dodridge assaulted her on the night in question by grabbing her, injuring her

ear, and throwing her down to the ground and hitting and kicking her.  The record

contains photographic evidence of injuries she sustained that night.  Additionally,

Dodridge's daughter, who was a witness to a portion of the events, testified that 1)

she was unable to call 911 despite the victim requesting her to do so; and 2) she

witnessed her father hitting and kicking the victim while she was laying on the

floor.  His daughter also identified several photos she took depicting the victim's injuries that were present on the night of the incident.  The record further contains testimony by the victim that Dodridge took her phone and tried to break it during the incident, preventing her from calling for help.

{¶60}  In light of this evidence, we cannot conclude that the outcome of the trial would have been different but for the provision of a limiting instruction related to the admission of these two documents.  Thus, we find no merit to the arguments raised under this assignment of error.  Accordingly, it is overruled.

## ASSIGNMENT OF ERROR V

{¶61}  In his fifth assignment of error, Dodridge contends that his counsel was ineffective for failing to object to the jury instructions or request a limiting instruction.  More specifically, Dodridge argues that although his counsel objected throughout the trial to the admission of impeachment evidence, counsel failed to 1) request the trial court issue a limiting instruction; and 2) object to the court's failure to instruct the jury regarding impeachment evidence.  The State responds by arguing that because the record contains testimony by the victim regarding the domestic altercation as well as exhibits depicting her injuries, the outcome of the trial would not have been different had counsel either requested a limiting instruction or objected to the instructions as given.

### Standard of Review

{¶62} The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984); *accord Hinton v. Alabama*, 571 U.S. 263, 272 (2014) (explaining that the Sixth Amendment right to counsel means "that defendants are entitled to be represented by an attorney who meets at least a minimal standard of competence").

{¶63} To establish constitutionally ineffective assistance of counsel, a defendant must show: 1) that his counsel's performance was deficient; and 2) that the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *E.g., Strickland*, 466 U.S. at 687; *State v. Myers*, 2018-Ohio-1903, ¶ 183; *State v. Powell*, 2012-Ohio-2577, ¶ 85. "Failure to establish either element is fatal to the claim." *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.). Therefore, if one element is dispositive, a court need not analyze both. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000) (stating that a defendant's failure to satisfy one of the ineffective-assistance-of-counsel elements "negates a court's need to consider the other").

{¶64} The deficient performance part of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), quoting *Strickland*, 466 U.S. at 688; *accord Hinton*, 571 U.S. at 273. Prevailing professional norms dictate that "a lawyer must have 'full authority to manage the conduct of the trial.' " *State v. Pasqualone*, 2009-Ohio-315, ¶ 24, quoting *Taylor v. Illinois*, 484 U.S. 400, 418 (1988).

{¶65} Furthermore, " '[i]n any case presenting an ineffectiveness claim, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.' " *Hinton*, 571 U.S. at 273, quoting *Strickland*, 466 U.S. at 688. Accordingly, "[i]n order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." (Citations omitted). *State v. Conway*, 2006-Ohio-2815, ¶ 95.

{¶66} Moreover, when considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be

considered sound trial strategy." *Id.* Additionally, "[a] properly licensed attorney

is presumed to execute his duties in an ethical and competent manner." *State v.*

*Taylor*, 2008-Ohio-482, ¶ 10 (4th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98,

100 (1985). Therefore, a defendant bears the burden to show ineffectiveness by

demonstrating that counsel's errors were "so serious" that counsel failed to function

"as the 'counsel' guaranteed * * * by the Sixth Amendment." *Strickland*, 466 U.S.

at 687; *e.g., State v. Gondor*, 2006-Ohio-6679, ¶ 62; *State v. Hamblin*, 37 Ohio

St.3d 153, 156 (1988).

## Legal Analysis

{¶67} To establish prejudice under the ineffective assistance of counsel

standard, a defendant must demonstrate that a reasonable probability exists that

" 'but for counsel's errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine the outcome.' "

*Hinton,* 571 U.S. at 275, quoting *Strickland*, 466 U.S. at 694; *e.g., State v. Short*,

2011-Ohio-3641, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph

three of the syllabus; *accord State v. Spaulding*, 2016-Ohio-8126, ¶ 91 (indicating

that prejudice component requires a "but for" analysis). " '[T]he question is

whether there is a reasonable probability that, absent the errors, the factfinder

would have had a reasonable doubt respecting guilt.' " *Hinton*, 571 U.S. at 275,

quoting *Strickland*, 466 U.S. at 695. Furthermore, courts ordinarily may not

simply presume the existence of prejudice but, instead, must require the defendant to affirmatively establish prejudice. *State v. Clark*, 2003-Ohio-1707, ¶ 22 (4th Dist.); *State v. Tucker*, 2002-Ohio-1597 (4th Dist. Apr. 2, 2002). As we have repeatedly recognized, speculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim. *E.g., State v. Tabor*, 2017-Ohio-8656, ¶ 34 (4th Dist.); *State v. Jenkins*, 2014-Ohio-3123, ¶ 22 (4th Dist.; *State v. Simmons*, 2013-Ohio-2890, ¶ 25 (4th Dist.); *State v. Halley*, 2012-Ohio-1625, ¶ 25 (4th Dist.); *State v. Leonard*, 2009-Ohio-6191, ¶ 68 (4th Dist.); *accord State v. Powell*, 2012-Ohio-2577 ¶ 86 (stating that an argument that is purely speculative cannot serve as the basis for an ineffectiveness claim).

{¶68} As set forth above, Dodridge argues that he received ineffective assistance of counsel by virtue of his counsel's failure to either request a limiting instruction or object to the jury instructions, with respect to the admission of the impeachment evidence discussed above. As noted under our analysis of Dodridge's fourth assignment of error, we agree that counsel should have requested that a limiting instruction be given. We further find that counsel should have objected to the trial court instructing the jury without including such an instruction as part of the overall instructions provided to the jury. However, assuming arguendo, that trial counsel acted deficiently by failing to make this request/objection, we have already determined that the outcome of the trial would

not have been different but for the provision of a limiting instruction related to the admission of these two exhibits.

{¶69} Here, we have already found that the trial court's admission of the victim's statement attached to the police report, as well as the Necco report, did not change the outcome of the trial and therefore did not result in plain error. We likewise found that the trial court's failure to give the jury a limiting instruction regarding the impeachment evidence did not result in plain error. Again, the record contains evidence in the form of testimony from the victim herself regarding the injuries inflicted by Appellant on the night of the incident. There is also evidence in the form of testimony from Appellant's daughter, who witnessed a portion of the events. Additionally, photos of the victim's injuries were admitted into evidence. Because of this, we now also find that the outcome of the trial would not have been different but for counsel's errors and, therefore, Dodridge has not proven the prejudice required in order to demonstrate a claim of ineffective assistance of counsel. Thus, we find no merit to the arguments raised under this assignment of error. Accordingly, Dodridge's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

{¶70} Dodridge contends in his sixth assignment of error that the State violated his right to due process when it failed to preserve materially exculpatory

evidence that had been requested in discovery. Dodridge also contends that the trial court erred in denying his oral motion in limine that was made the morning of trial, which requested that the State not be permitted "to introduce photographs because it destroyed the body camera footage and the messages containing photographs allegedly sent to Sergeant McKnight from [the victim]." Dodridge argues that video footage from Captain Gue's body cam would have been both materially exculpatory and potentially useful had he actually activated his camera pursuant to the police department's policy. Dodridge further argues that the State acted in bad faith to the extent that it did not request Sergeant McKnight's body cam footage in a timely manner prior to it being destroyed pursuant to policy. The State responds by arguing that neither Gue or McKnight had any interaction with Dodridge when they responded to the incident and it also argues that Dodridge cannot prove that the State acted in bad faith in failing to preserve the one minute and forty-nine second footage of video from McKnight's body cam.

### Standard of Review

{¶71} A criminal defendant's due process right to a fair trial is violated when the prosecution withholds materially exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *State v. Geeslin*, 2007-Ohio-5239, ¶ 7; *State v. Johnston*, 39 Ohio St.3d 48, 60 (1988). *State v. Fox*, 2012-Ohio-4805, ¶ 25 (4th Dist.). To determine if a defendant's alleged due process rights are violated, courts

characterize lost or destroyed evidence as: 1) "materially exculpatory"; or 2) "potentially useful." *State v. Gerald*, 2014-Ohio-3629, ¶ 15 (4th Dist.). Evidence is materially exculpatory " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *State v Johnston*, , *supra*, at 61, quoting *United States v. Bagley*, 473 U.S. 667, 682; *Fox, supra*, at ¶ 25.

{¶72} The *Brady* test is stringent and it has been held that the constitutional "materiality" requirement is not met when there is only a mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial. *Fox, supra*, citing *State v. Jackson*, 57 Ohio St.3d 29, 33 (1991), in turn citing *United States v. Agurs*, 427 U.S. 97, 109-110 (1976). *Accord Arizona v. Youngblood*, 488 U.S. 51, 56 (1988), fn. 1; *State v. Rivas*, 2009-Ohio-1354, ¶ 14 (stating that speculation is not sufficient to establish that withheld evidence is material). Whether evidence is materially exculpatory is a question of law. *See State v. Blanton,* 2018-Ohio-1278, ¶ 88 (4th Dist.), citing *Geeslin* at ¶ 12-13 (not specifically setting forth standard of review but appearing to review materially exculpatory question as a matter of law).

{¶73} Ordinarily, a defendant bears the burden to prove that withheld evidence is materially exculpatory. *Fox* at ¶ 26; *Rivas* at ¶ 14; *State v. Lupardus*

2008-Ohio-5960, ¶ 20 (4th Dist.). However, when a defendant specifically requests a particular piece of evidence and that evidence is subsequently lost or destroyed, the burden shifts to the State to show that the evidence was not materially exculpatory. (Citations omitted). *Lupardus* at ¶ 21. The burden does not shift to the State if the defendant makes only a general request for discovery. *Lupardus* at ¶ 22. Instead, for the burden to shift to the State, the defendant must have made a specific request regarding the particular piece of evidence. *Lupardus* at ¶ 22. Thus, when "evidence is destroyed pursuant to routine procedures before any request for it has been made, it is not the State's burden to show that the evidence was not exculpatory, but rather Defendant's burden to show that it was exculpatory." *State v. Terry*, 2004-Ohio-7257, ¶ 15 (2d Dist.).

{¶74} If a defendant is unable to show that the withheld evidence is materially exculpatory, a defendant may instead show a violation of his due process right to a fair trial if the prosecution withheld, in bad faith, potentially useful evidence. *Geeslin* at ¶ 14. In *Gerald*, this Court observed that the term "bad faith" generally suggests something more than bad judgment. *Gerald, supra*, at ¶ 18, citing *State v. Buhrman*, 1997 WL 566154, *12 (2d Dist. Sept. 12, 1997). Instead, the term " ' "imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or [ill] will

partaking of the nature of fraud." ' " (Citations omitted).  *Id.*  The term "bad faith"

also includes an actual intent to mislead or deceive another.  *Id.*

Legal Analysis

{¶75}  Here, we must first consider who bears the burden to show whether

the body cam footage and photos were materially exculpatory.  Dodridge

specifically requested this evidence in discovery multiple times; however, the State

failed to preserve it or prevent it from being destroyed pursuant to its evidence

retention policy.  Therefore, we find the burden shifted to the State to prove that

the requested evidence was not materially exculpatory.

{¶76}  Initially, with respect to Dodridge's assertions related to Captain Gue

not activating his body cam during the incident and Sergeant McKnight only

activating his body cam for less than two minutes, other courts have determined

"that a failure of the police to create an audio or video recording, even if the

recording could be potentially useful to the defense, does not violate a defendant's

due process rights."  *State v. Wyse*, 2022-Ohio-1979, ¶ 15 (6th Dist.).  This is

because, according to *Wyse*, "[t]he law is clear that '[t]he Due Process Clause of

the United States Constitution does not require the state to employ particular

investigative techniques to the defendant's liking.' "  *Id.*, quoting *State v. Wooten*,

2002 WL 488122, *3 (4th Dist. Mar. 25, 2002).  In *Wyse*, the responding officer

failed to activate his body cam until after the defendant was placed under arrest for

violating a "stay at home order" during the recent pandemic. *Wyse* at ¶ 6-8. The court found that the officer "had no constitutionally mandated duty to record his encounter with Wyse" and that "his failure to create such evidence did not result in any violation of Wyse's due process rights." *Id.* at ¶ 17. Applying the reasoning set forth in *Wyse,* which we conclude is sound, we cannot conclude that Dodridge's due process rights were violated when Captain Gue failed to activate his body cam when he responded to the incident at issue. The same is true regarding Sergeant McKnight's failure to record the encounter, with the exception of two minutes.

{¶77} We next consider whether the video footage was materially exculpatory or potentially useful and, if the latter, was it withheld in bad faith by the State. Again, evidence is materially exculpatory " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *State v Johnston, supra,* at 61, quoting *United States v. Bagley, supra,* at 682; *Fox, supra,* at ¶ 25. The only possible video footage that could have been disclosed was the one minute and forty-nine second clip from Sergeant McKnight's body camera. The victim testified during the hearing on the motion to compel that she did not remember any interaction with McKnight on the day the report was made. Further, although she claimed that Captain Gue and CPS informed her that her children would be taken if she didn't cooperate, she testified at the hearing on the motion to compel and again during the

trial that the statement she provided to police after the incident was accurate and that she had told the truth, despite the fact that she did not want to provide a statement.

{¶78} Assuming video footage was actually created by McKnight's camera, and that the one minute and forty-nine second clip consisted of more than the time it took McKnight to take photos of the victim's injuries, the footage was simply an interview of the victim after the alleged domestic violence incident had concluded. As argued by the State in its brief, Dodridge was not present at the time the video was created. Bearing in mind the evidence in the record of Dodridge's guilt, which will be more fully discussed under Dodridge's next assignment of error, we cannot conclude that there was a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different. Therefore, we conclude the State met its burden of proving that the body cam video footage, assuming it was even created in the first place, was not materially exculpatory.

{¶79} Furthermore, in the event the body cam video footage could be somehow considered potentially useful, there has been no showing of bad faith. As set forth above, in order to demonstrate bad faith, a defendant must show something more than bad judgment or negligence, it must demonstrate conscious wrongdoing or breach of known duty through ill will, such as an actual intent to

mislead or deceive. *See Geeslin* and *Gerald, supra*. Here, the chief of police testified regarding the department's policies and procedures. She explained that data is stored by a third party and that it is automatically destroyed after 180 days unless it is specifically flagged as evidence. However, through the Chief's testimony it was established that had the video footage been requested by the prosecutor in a timely manner, it would have been able to be retrieved and provided before it was destroyed.

{¶80} Sergeant McKnight testified that the department policy at the time of the incident provided that the detectives, not the responding officers, were the ones to decide what data should be flagged as evidence once a report was filed. If the data wasn't specifically flagged, it was destroyed after 180 days by the third party storage service pursuant to policy. Importantly, Sergeant McKnight testified that the police department had since changed their procedures with respect to evidence storage, now requiring each individual officer to download their video footage to a CD and attach it to each police report that is made. After considering the record before us, we conclude the above evidence demonstrates negligence on the part of the State in failing to preserve potentially useful evidence. However, we cannot conclude that it rises to the level of bad faith.

{¶81} We finally address the trial court's denial of Dodridge's oral motion in limine made the morning of trial. We first note that it is not altogether clear

from the record what exactly happened regarding the photos taken by Sergeant McKnight on his body cam and the photos received by him from the victim on his body cam. The jury trial transcript references a conversation that was had between the prosecutor and defense counsel just prior to trial regarding the accidental erasure of some photos. The details surrounding the accidental erasure, or which photos were involved, are unclear.

{¶82} At the start of trial defense counsel made a motion in limine "to exclude the photographs in this case." Counsel stated that "[t]here's been testimony about no one is really sure who took what photograph, and the like." Counsel referenced a handwritten interoffice communication from Sergeant McKnight indicating there were some photos that were sent to his personal cell phone that had been destroyed. Counsel argued that, as a result, the defense did not "have any idea, as we sit here, or any way to defend, definitively, as to when these photographs were taken." Thus, it appears the defense was requesting that all of the remaining photographs be excluded from evidence because there seemed to be some additional photos that were taken by the victim and sent to Sergeant McKnight's personal phone that were accidentally either erased or destroyed, and were therefore unavailable at trial.

{¶83} The trial court denied this motion from the bench, referencing the fact that the remaining photographs were entered into the record during the hearing

on the motion to compel, as well as the fact that the victim "validated" the photos

and stated she had taken the photos. The trial court ruled that the photos had been

properly authenticated and that the defense would be permitted to cross-examine

the witnesses regarding the photos, or have the option to call witnesses itself as

part of its case-in-chief, if the witnesses were not called by the State.

{¶84} " 'The admission or exclusion of evidence generally rests within a

trial court's sound discretion.' " *State v. Allen*, 2022-Ohio-1180, ¶ 21 (4th Dist.),

quoting *State v. McCoy*, 2020-Ohio-1083, ¶ 20 (4th Dist.). " 'Thus, absent an

abuse of discretion, an appellate court will not disturb a trial court's ruling

regarding the admissibility of evidence.' " *Id.*, quoting *McCoy* at ¶ 20. "The

requirement of authentication or identification as a condition precedent to

admissibility is satisfied by evidence sufficient to support a finding that the matter

in question is what its proponent claims." Evid.R. 901(A). One way this can be

accomplished is with "[t]estimony that a matter is what it is claimed to be."

Evid.R. 901(B).

{¶85} Here, as noted by the trial court, at the time the defense put forth its

motion in limine, the victim had already testified regarding the photos during the

hearing on the motion to compel. She affirmed during the hearing, in response to

questioning by the trial court, that each of the photos sought to be admitted were

photos of her body that were taken on the night of the incident. Thus, the victim

testified that the photos were what the state claimed they were, photos either taken by Sergeant McKnight on his body cam, photos taken by herself on her phone, or photos taken on her phone by her step-daughter, who was present during and after the incident. The same photos that were admitted into evidence during the hearing on the motion to compel were the same photos ultimately admitted during the jury trial.

{¶86} For the foregoing reasons, we conclude the trial court did not err or abuse its discretion when it allowed the State to introduce the photos at trial that had already been properly made part of the record during the hearing on the motion to compel. Thus, we find no merit to Dodridge's sixth assignment of error and it is therefore overruled.

## ASSIGNMENT OF ERROR VII

{¶87} Dodridge contends in his seventh assignment of error that the trial court erred when it denied his motion for acquittal as to the charge of disrupting public services. He argues that the State failed to provide sufficient evidence that he purposely by any means interrupted or impaired telephone service on the night of the incident. The State responds by arguing that the testimony of the victim at trial established all of the elements of this offense and, therefore, the trial court did not err in overruling Dodridge's motion for acquittal.

Standard of Review

{¶88} A motion for judgment of acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 2005-Ohio-1507; ¶ 39, *State v. McMurray*, 2015-Ohio-2827, ¶ 37 (12th Dist.). The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 2006-Ohio-2417, ¶ 37; *State v. Johnson*, 2016-Ohio-867, ¶ 9 (4th Dist.); *State v. Conley*, 2014-Ohio-1699, ¶ 14 (12th Dist.), citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995); *State v. Hernandez*, 2009-Ohio-5128, ¶ 6 (10th Dist.).

{¶89} Whether sufficient evidence exists to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted). *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, an appellate court will not weigh evidence or assess the witnesses' credibility. *State v. Walker*, 55 Ohio St.2d 208, 212 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Therefore, a court must conduct "a review of the elements of the charged offense and a review of the state's evidence." *Id*. "In deciding if the evidence was

sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.), citing *State v. Williams*, 2011-Ohio-6267, ¶ 25 (1st Dist.); *State v. Bennett*, 2019-Ohio-4937, ¶ 46 (3d Dist.); *State v. Wells*, 2022-Ohio-3793, ¶ 32 (4th Dist.).

Legal Analysis

{¶90} Here, the jury found Dodridge guilty of one count of disrupting public services, a fourth-degree felony in violation of R.C. 2909.04(A)(1), which provides as follows:

> (A) No person, purposely by any means or knowingly by damaging or tampering with any property, shall do any of the following:
>
> (1) Interrupt or impair television, radio, telephone, telegraph, or other mass communications service; police, fire, or other public service communications; radar, loran, radio, or other electronic aids to air or marine navigation or communications; or amateur or citizens band radio communications being used for public service or emergency communications[.]

{¶91} Dodridge argues that his counsel moved for a Crim.R. 29(A) motion for judgment of acquittal because: 1) the State failed to provide sufficient facts that the victim took any action to call 911; and 2) because the evidence showed there was another phone in the house that was available during the incident. Dodridge now argues that although the evidence in the record shows that he did have the victim's phone in his possession for an unknown amount of time, the

victim did not ask for it to be returned to her, and he left the phone in the house, undamaged, when he left the house. He also argues that the victim testified that she had no intention of calling the police that day, and that there was another phone in the house available for her use at the time.

{¶92} The State contends, on the other hand, that the victim testified that Dodridge grabbed her phone and keys during the incident, that she wanted to call the police just so that Dodridge would leave, that she did not have a house phone, and that she did not have other means to call for help. The State further notes that during its re-direct examination of the victim, she confirmed that Dodridge had her phone during the domestic violence incident, that he tried to break her phone, that he wouldn't give her the phone, and that she couldn't call 911.

{¶93} A review of the trial testimony reveals that although the victim was inconsistent at times regarding whether Dodridge tried to break her phone, whether there may have been another phone in the house, and whether she had actually intended to call the police when the incident was occurring, when pressed, the victim did confirm at trial that Dodridge took her phone while the incident was occurring, that he tried to break it, and that she didn't know where her phone was until she found it after he left the house. She also confirmed on re-direct that she had wanted to call 911 to get Dodridge to leave, but that he prevented her from calling. She testified that although her step-daughter might have had a phone with

her that night, she had not seen another phone that night. Moreover, Dodridge's teenage daughter, who was an eyewitness to the events that night, testified that the victim yelled at her and asked her to call 911, but that she could not because she didn't have a phone. She testified that she didn't have a phone, that there was no phone in the house, and that she could see that Dodridge had phones in each of his pockets.

{¶94} The Third District Court of Appeals upheld a conviction for disrupting public services where the record contained evidence that 1) the defendant took the victim's phone as she was "unlocking it" to call law enforcement; 2) the defendant threw it against the wall; and 3) the victim did not find the phone until after the incident was over and the defendant had left. *State v. Jackson*, 2019-Ohio-170, ¶ 67 (3d Dist.). Further, Dodridge concedes in his brief that "[e]vidence that an accused took a cellular phone away from the victim in order to prevent the victim from calling 911 will support a conviction under R.C. 2909.04(A)(1)."

{¶95} After viewing the evidence set forth above in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found all of the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks,* 61 Ohio St.3d 259, paragraph two of the syllabus. The jury, as the trier of fact, could draw inferences and make conclusions based upon the evidence

adduced at trial. Our review of the record reveals that the evidence adduced at trial is sufficient to support the claim that Dodridge committed the crime of disrupting public services because the evidence, if believed, would convince the average mind of Dodridge's guilt beyond a reasonable doubt. Accordingly, we find no merit to Dodridge's seventh assignment and it is overruled.

## ASSIGNMENT OF ERROR VIII

{¶96} In his eighth assignment of error, Dodridge contends that the cumulative effect of these errors deprived him of a fair trial. He argues that several errors were made by the trial court and counsel which affected the outcome of his case. The State disagrees with Dodridge's argument that several errors were made at trial and claims that the outcome of the case was not affected the alleged errors.

### Standard of Review

{¶97} Under the cumulative error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995), citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus; *State v. Ruble*, 2017-Ohio-7259, ¶ 75 (4th Dist.). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Smith*, 2016-Ohio-5062, ¶

106 (4th Dist.), citing *State v. Harrington*, 2006-Ohio-4388, ¶ 57 (4th Dist.). The cumulative error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.' " *State v. Mammone*, 2014-Ohio-1942, ¶ 148 ("And to the extent that Mammone more broadly invokes the doctrine of cumulative error, that doctrine does not apply because he cannot point to 'multiple instances of harmless error.' "); *State v. Colonel*, 2023-Ohio-3945, ¶ 64-66 (4th Dist.); *State v. Fannon*, 2018-Ohio-5242, ¶ 124-125 (4th Dist.).

## Legal Analysis

{¶98} Here, we have rejected Dodridge's argument that the trial court erred or abused its discretion in declaring the victim to be a hostile witness. We also rejected his argument that the trial court committed plain error in interrogating the victim during trial. Although we did find error with respect to the trial court's admission of the victim's prior written statement that was attached to the police report, we found that error to be harmless. With respect to Dodridge's arguments related to the failure to both request and provide a limiting instruction regarding impeachment evidence, we found no plain error on the part of the trial court and because Dodridge could not show prejudice, i.e., that the outcome of the trial was affected by the failure to request a limiting instruction, we rejected his argument that he was denied the effective assistance of counsel. Finally, we found the State met its burden of showing that the missing body cam footage was not materially

exculpatory and although we found the State was negligent in failing to request the video footage sooner, we found no bad faith on the part of the State related to this failure.

{¶99}  Thus, despite Dodridge's many challenges on appeal, we have found only one instance of harmless error.  As such, because Dodridge has not pointed to "multiple instances of harmless error," we cannot conclude that cumulative errors violated his constitutional right to a fair trial.  Accordingly, we find no merit to the arguments raised under Dodridge's eighth and final assignment of error and it is, therefore, overruled.

{¶100}  Having found no merit in any of the arguments raised by Dodridge on appeal, all eight of his assignments of error are overruled.  Accordingly, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. and Wilkin, J., concur in Judgment only.

For the Court,

_____
Jason P. Smith
Presiding Judge

## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**